HENRY SCHNATHORST, Appellee, v. EARL S. WILLIAMS, Appellant, and WARD WILLIAMS.

No. 47346.

(Reported in 36 N. W. 2d 739)

562

April 5, 1949.

Brierly & McCall, of Newton, for appellant.

Ves H. Morgan and Campbell & Campbell, all of Newton, for appellee.

BLISS, J.—On August 23, 1946, Earl S. Williams, who we will refer to as the defendant, filed an information before a

justice of the peace at Newton, Iowa, accusing plaintiff, Henry Schnathorst, a farm hand in the employ of the informant and his son, Ward Williams, of the larceny in Jasper County, Iowa, on August 16, 1946, of a 1929 Model A Ford Tudor Sedan, which the informant had sold to plaintiff on a conditional-sale contract. Plaintiff was arrested by peace officers at Marshall-town on Friday, August 23, 1946, and placed in jail there for the night. The next day the sheriff of Jasper county under warrant issued on the information arrested plaintiff and took him before the justice of the peace at Newton. Plaintiff told the justice he was not guilty and waived preliminary hearing, and was ordered held to answer to the district court of Jasper County, Iowa. In default of bond plaintiff was committed to the county jail where he was held until two p. m. on August 27, 1946, when he was released under bond.

On October 3, 1946, M. J. Carey, the county attorney, with the defendants as witnesses appeared before the grand jury of the county, and after presentation of the charge, hearing of the testimony of defendants offered by the county attorney, with no testimony in behalf of the accused, the grand jury refused to indict. The county attorney then prepared and filed in the office of the clerk of the district court the following dismissal of the charge against the plaintiff herein, commonly called a "No Bill", to wit, "Upon investigation, the Grand Jury refuses to find an indictment and the charge is therefore dismissed. [signed] M. J. Carey, County Attorney of Jasper County, Iowa." The prosecution was thus ended.

On October 21, 1946, plaintiff filed his petition alleging the matters above set out, and that the defendants Earl S. Williams and Ward Williams had by conspiracy instigated and procured the criminal prosecution willfully, deliberately and maliciously without probable cause, and for wrongful purpose, thereby causing plaintiff to be held up to public hatred and ridicule and to suffer mental and bodily pain and suffering and other injury, to his great damage.

Defendants filed answer admitting the refusal of the grand jury to indict, the filing of the information, but alleged that it was filed in good faith, without malice, with probable cause and

upon the advice of the county attorney after full and true disclosure to him of all the facts. They further alleged that plaintiff had severed his employment with them without notice and left with the car owing them a balance of $32 on the purchase price and money expended on the car, and they were unable to find plaintiff or the automobile. All other allegations in the petition were denied. Plaintiff's reply denied the affirmative allegations of the answer.

There is no dispute over much of the evidence. Defendant owned a 260-acre farm in the east part of Jasper county about two miles from the 120-acre farm of his son, Ward, which farms they operated together. Plaintiff, about thirty years old, living with his wife and family in Poweshiek county near the east Jasper county line, had worked for the defendants on their farms during most of the year 1945. He was a good workman and his relations with his employers were pleasant and agreeable. He had two children, seven and eight years old, and a third child was born about January 1, 1946. After corn picking in 1945 he was without work and defendant advanced him about $189 for family expenses. He lived about three miles from the Williams' land, and for transportation to and from his home and work in 1946, defendant bought plaintiff the Ford car described above, for which defendant paid the dealer $180, on December 29, 1945. On that date a "Contract and Agreement" was executed by defendant, as first party, and plaintiff, as second party. It provided that whereas the first party was the owner of the car, and had paid the ceiling price therefor and the insurance and license on the car, and might at his option repair it, and that second party desired to use the car, it was agreed that he should pay for said use the sum of $20 monthly commencing on January 2, 1946, by deduction from his monthly wage, and that upon payment in full of the cost price of the car, insurance, license, and all repair expense, first party would transfer the car to second party. It was also agreed that if second party should quit the employment before all said amounts were fully paid, first party might retain ownership of the car and all payments made "as liquidated damages for the use of the car," and also first party had the option to cancel the contract and to retain ownership of the car and payments as above

noted, if second party should default in any monthly payment.

On January 22, 1946, a casualty company issued a policy to the defendant as the insured, covering the period from December 29, 1945, to the same date in 1946. The coverages A, B and C, for which insurance was payable to defendant, were for bodily injury, property damage and medical payments, for which items the premium charges were $14.60. The coverages for deductible collision or upset, fire, theft or windstorm were, as stated in the policy, "payable as interest may appear to the named insured and Henry Schnathorst." The premium charge for the last-noted coverages was $12. While plaintiff was being charged with the entire premium of $26.60, he was rightly chargeable with but $12. He had no protection under the policy for coverages A, B and C, yet he, and not the defendant, was liable for casualties thereunder, under section 321.51, Code of 1946, and Hansen v. Kuhn, 226 Iowa 794, 285 N. W. 249.

About March 15, 1946, plaintiff was verbally employed as a farm hand on the two farms for a monthly wage of $100, one quart of milk and his noon meal each day, and the monthly rental of $12.50 for the home in which he and his family lived. Defendant or Ward had paid the premium of $26.60, $10.50 for car license on March 15, 1946, $10.36 on March 23, 1946, and $18.85 on April 30, 1946, for car repairs. The payments for repairs were made to the service men, and plaintiff saw none of the statements. Plaintiff's entire indebtedness for cost of the car and the items listed above never exceeded $246.31. It is conceded by all parties that five monthly payments of $41 each—April 15, May 15, June 15, July 15, August 15—or $205 were deducted from plaintiff's wages and credited on the car debt, leaving a balance owing thereon on August 16, 1946— the date of the alleged theft of the car—of $41.31. Deducting therefrom, as it should be, the sum of $14.60 for premiums under coverages A, B and C, he was owing on the car debt on August 16, 1946, the sum of $26.71. He testified that on said date when he left he was not certain of the amounts of the different items of the debt. But he had at that time paid over eight ninths of the total car debt. No payment under the contract was in default. It was alleged in the answer and testified by defendant

that the balance on the car debt was $32. Defendant told the county attorney that $205 had been credited on the car debt. He did not tell him the amount of the premiums or the license fee, but told him the price of the car was $180 and repairs amounted to approximately $20 and that the back account for money furnished plaintiff was $189. The county attorney testified:

"He [Earl] told me the car was not paid for, but he didn't say how much Schnathorst owed on the car. * * * *I couldn't obtain very satisfactory information from Williams as to just how that had been done. * * * He [Earl] said he didn't know they were always too careful to specify how much went on the car and how much went on the unsecured indebtedness."

He was not entirely fair with the county attorney in this statement. He knew every wage deduction had been applied on the car debt. The receipts he gave plaintiff show this to be a fact and his testimony concedes it.

Although by the contract plaintiff was granted the possession and use of the car, and the insurance policy specified that it was to be used for business and pleasure, yet it was the contention of defendant that plaintiff's use of it was limited. He testified:

"I never gave him the privilege to drive it to Marshalltown only when he was working. That was my agreement with him. He was to use the car for transportation back and forth to work, never gave him no privilege to drive it any place he wanted to go. I never told him he could not drive it in Poweshiek county. He never asked whether he could drive in Marshall county. * * * He used the car for transportation back and forth to work and to get his groceries, but not to go off on trips."

Defendant testified that if he failed to tell the county attorney all of the facts involving the automobile he was not aware of it. Assuming that he told the county attorney of these claimed limitations of plaintiff's use of the automobile, the jury might well have found that any such statement to the county attorney was neither fair, full, nor correct, because of the contract and the policy, and because for three and one-half months

prior to March 15, 1946, plaintiff had the car in Poweshiek county where he lived and used it as he pleased, and defendant testified that "he knew plaintiff drove it all over the county." The jury could have found that defendant's testimony as to the limited use was to give the impression to the jury that plaintiff's operation of the car on and after August 16 was wrongful. Plaintiff testified that he believed he had the "right to drive it where I pleased unless, of course, I didn't take it out of the state."

Defendant told the county attorney that plaintiff had quit his employment—meaning permanently. The record is such that the jury, with good reason, could have found that plaintiff had not severed his employment permanently, and that defendant had no probable cause for so believing, or so telling the county attorney. When plaintiff left the farm on August 16 he had been paid his wages in full. He then asked defendant for an advance of $25 on his next month's wages, and defendant gave him a check for that amount, marked "Labor." When he was on his way home after he was released from jail, he stopped at defendant's home and asked him for the car. There is no evidence that defendant ever made any claim that he had elected to keep the car because plaintiff had quit work. Plaintiff testified that defendant told him "he couldn't let me have the car until the insurance company O.K.'d it. There wasn't anything said that day about coming back to work. After I was home a few days Earl and Ward came over. They wanted to know if I was coming back to work. I told them I wasn't sure, I didn't feel like I ought to. There would be hard feelings all the time between us. * * * I never told either Earl or Ward Williams I was going to quit my employment until after I was out of jail when they came down there and talked to me. * * * I didn't decide to quit until after this matter occurred."

Defendant and his son were apparently desirous of retaining the plaintiff's services. They did not regard him as a thieving person. Defendant testified: "At the time I signed the information I never knew of Henry Schnathorst ever having stolen anything else." It does not appear that he told the county attorney this. But the county attorney testified: "I asked him if

Mr. Schnathorst was a satisfactory hired man and he said, yes, he was a very satisfactory hired man. I had no difficulty whatever and I can't think why he would want to leave or why he did leave."

At the noon meal on Friday, August 16, 1946, defendant asked plaintiff if he would like to take the afternoon off and take his family to an Old Settlers' reunion at Lynnville, and return that evening and do the chores at Ward's farm as he was in the hospital. Plaintiff did not go to the reunion but instead he went to Grinnell and then came back to Kellogg and stayed that night with a Mr. McBroom, with whom he remained until Saturday noon, August 17, when he returned to his own home and stayed with his family from then until Monday morning, August 19, when he drove away without telling his wife where he was going. He had not told her where he was Friday night, and apparently neither was in a friendly mood Monday morning. He had been in the motor trucking business for eight years at Marshalltown and he testified that he drove to Marshalltown and spent his time with some old trucker friends. In the past he had used intoxicating liquor to some extent, but his wife testified that she knew he had not used it during the past year, and that in the year previous she saw no indication of its use.

Earl Williams called on her the evening of August 16, and Earl and Ward came to her home on Tuesday, August 20, and on Thursday, August 22 and then learned that he had been home over the week end and left on Monday. Plaintiff was a diabetic and administered the insulin to himself, and if the dose was too little or too much he had severe nervous spells. Testifying to her talks with Earl and Ward on these two calls, she said:

"I told them Henry had gone before, that he had nervous spells and he would go, *but he always came back.*" (Italics added.) There is no evidence that defendant told the county attorney this. "Q. What did they say? A. They wondered if they should do something. They said they were wondering about the insurance on the car. They were afraid something would happen and the insurance wouldn't be any good. I said if they wanted to have the car picked up, that was all right

with me, they could do what they felt they should. I told them I didn't know where Henry was. I was upset about it. I told them I had been to talk to the county attorney. In the second conversation I had with Earl and Ward Williams that week they said they were still worried about the insurance and that they didn't want to file against him."

This testimony is not denied and there is much other testimony to corroborate it. It tends strongly to show the mental attitude of Earl and Ward Williams, and the real moving force back of the filing of the larceny information. The notion which was bothering them, and the jury could so find, was not that the plaintiff had stolen the car, but that in his driving about his negligence might make them liable in damages to someone, and they would have no protection under the insurance policy. Defendant testified: "I didn't altogether consider I had a right to take that car." Of his talk with plaintiff's wife on Thursday, he testified: "I wanted to know where Henry was. She said she didn't know. *I said the insurance on his car will run out in a short time and I would like to know where I can locate him.*" He also testified:

"On Friday [August 23] *I took the insurance policy to the insurance agent at Grinnell.* * * * *I told him my hired man had left with this car. Here was the policy and I want to know what to do about it. He said it would expire in 3 or 5 days and he said you had better go to your county attorney and see what his advice would be.* So I came that afternoon to see Mr. Carey, the county attorney. * * * *I told him that I had been to see the insurance man at Grinnell and that the insurance agent said the policy would expire in 3 to 5 days unless I got the car back. I asked Mr. Carey what would be the best thing to do here in this case.*"

After defendant had told the county attorney his story, the latter testified he told him:

"I said, you understand, Mr. Williams, that so far as the car is concerned that the state will take no part in getting your car back and he said, 'yes, I understand that.' All that the state will be willing to do if you see fit to file an information against

him charging him with a crime that is triable upon indictment in this county and we decide that there is enough evidence for that, I will permit you to file an information charging that offense, or charging an offense, and Mr. Williams said 'I hate to have him arrested' but he said he is gone and *the insurance [agent] has said something about the insurance would be invalid if something wasn't done at once* and they had requested him to take it up with the county attorney. * * * *Well, he said, what do you think the crime would be.* I said under these circumstances that you have detailed to me and under the provisions of this contract in my opinion, Mr. Schnathorst is guilty of the crime of the larceny of an automobile *and he said that's the charge I want filed."* (Italics added.)

There is nothing in the record, either by other testimony, or by the provisions of the insurance policy, that corroborates defendant in his testimony that the insurance agent told him the policy would expire in either "3 or 5 days" or "3 to 5 days" unless defendant got the car back. Mr. McDowell, the insurance agent at Grinnell, whom defendant consulted on August 23 was called as a witness for the defense. It is very significant that this witness was not asked a single question by defendant as to what was said by either him or Williams in that conversation. The whole of his testimony on that matter consisted of one sentence: "Mr. Williams came to the office on August 23, 1946, and I had a conversation with him about this policy of insurance."

There is other testimony on the insurance phase of this case similar to that above, throwing light upon the motives, purpose and animus of defendant in instigating the criminal prosecution, and upon his alleged good faith in doing so, as he expressed it, simply to make the plaintiff "just."

Mrs. John McGrath, sister of plaintiff, with her husband talked with defendant on Saturday evening, August 24: "He told us about the car and that Henry had been arrested for taking the car. *He said the insurance company had him arrested.* * * * When my husband asked Earl Williams where Henry was he hesitated about answering. * * * He said that the insurance policy on the car would be cancelled if the car was gone over

three days." Mr. McGrath gave testimony like that of his wife. Of this conversation, defendant testified:

"I told them the insurance would have to be taken care of and that the car was in the hands of the county attorney and the insurance company. * * * I told her it was up to the county and the insurance company on the car. * * * Ward and I went and got the automobile in Marshalltown. We took it to Grinnell and left it at the Norris garage. When Henry and Mr. and Mrs. McGrath came to my place after Henry was out of jail they wanted to know where the car was and if Henry could have the car. I told them it was in the hands of the county and insurance company and I couldn't do anything about it at that time. I didn't tell them the car was over in Poweshiek county."

Mrs. Schnathorst testified that on Sunday, August 25, she and her two brothers had a conversation with Earl at his home, to wit, "I went over to ask him what charges were filed and just how things were. He said there were no charges filed, that he had gone up to the insurance company to get some information and they had taken it over. That was all he had done." Plaintiff testified that he had talked with defendant at the sheriff's office before he was taken to Meredith, the Justice of the Peace, and this was said: "I asked him about the charges and he said it was put into the insurance company's hands and he didn't have anything to do with it anymore." (Italics added.) The truth of this testimony was for the jury to determine. It could have found that the statements of defendant were not the facts, and were in large part directly contrary to what the county attorney testified he told him. The car was not in the hands of the county attorney nor of the insurance company, and there is no evidence that the insurance company had anything to do with the instigation of the prosecution of plaintiff.

The evasion, equivocation and misstatements of defendant were matters of importance for the consideration of the jury in passing upon the good faith and veracity of defendant, and upon the credibility and probative value of his testimony on all matters submitted.

When the county attorney gave defendant the information which the county attorney had prepared, charging that the

plaintiff did ."willfully, unlawfully, and feloniously steal, take and carry away" the car on August 16, 1946, and told him to swear to it before, and file it with the justice of the peace, he said to defendant, "I presume that the sheriff will put it on the air, so that other officers will be on the lookout for Mr. Schnathorst." Although forewarned of this and other probable publicity, defendant was not deterred. He swore to the information and left it with the magistrate for filing.

On the trial of the cause the jury returned a verdict for the plaintiff for $750 against the defendant, Earl S. Williams.

Defendant assigns as errors the denial of his motions to direct a verdict for him at the close of plaintiff's case, and at the close of all of the evidence; in giving instruction No. 10; and the refusal to grant a new trial because of misconduct of the jury.

I. To recover, the plaintiff had the burden to show: (1) the criminal prosecution of plaintiff (2) its procurement by defendant (3) its termination favorable to plaintiff by the failure to indict resulting in his discharge (4) lack of probable cause, and (5) malice in the instigation of the prosecution.

The first three of these essentials were established by plaintiff beyond question. They are conceded. The refusal to indict and the dismissal by the county attorney established prima facie essential (4)—the want of probable cause—and also made the establishment of malice essential (5)—a permissible inference by the jury.

II. The refusal of the grand jury to indict the plaintiff on the charge for which he was held to answer after hearing the evidence of the defendants, and the dismissal of the charge by the county attorney, furnished prima-facie evidence that the criminal prosecution of Henry Schnathorst was without probable cause, the fourth essential noted in Division I hereof. This prima-facie establishment of the want of probable cause cast upon the defendants the burden of then going forward with the evidence and overcoming the prima-facie showing. The burden of proof, in its true sense, that is, the requirement that the plaintiff establish .every essential element of his case, of course, never shifted, but remained with him to the end.

There is no question about the principles above stated in Iowa. In Hepker v. Schmickle, 209 Iowa 744, 746, 747, 748, 229 N. W. 177, 178, the course of criminal prosecution was the same as in this case. The opinion states:

"Appellee [plaintiff] was arrested under the information, furnished an appearance bond, waived preliminary hearing, and was bound over to the grand jury.' After an investigation the grand jury refused to indict. *.* * Does the evidence here show conclusively that the prosecution was begun with probable cause? We think not.. As previously stated, the grand jury refused to indict, and the defendant was dismissed. Apparently, however, the district court, in submitting the cause to the jury, did not tell them that defendant's discharge could be considered as a presumption in favor of nonprobability. * * * Upon the general subject, however, see Hidy v. Murray, 101 Iowa 65; Wilson v. Lapham, 196 Iowa 745."

On appeal this court held that all issues were properly submitted to the jury, and affirmed the judgment for plaintiff, on a condition not pertinent here.

In Hidy v. Murray, supra, 101 Iowa 65, 69 N. W. 1138, an action for malicious prosecution, a judgment for the plaintiff was affirmed. In that case it was established that the defendant filed the information, and in a preliminary hearing before the magistrate, on the evidence offered by the state, without evidence in behalf of the accused, the latter was discharged. This court held that the discharge of the accused by the magistrate made a prima-facie showing of want of probable cause requiring the defendant in the malicious prosecution action to go forward with the evidence to overcome the showing. The court also stated at page 68 of 101 Iowa, page 1139 of 69 N. W.: "It would be quite difficult, with this *prima facie* showing of a want of probable cause, to avoid a substantial conflict, so as not to make the question one for the jury."

In Richmond v. Whitaker, 218 Iowa 606, 611, 255 N. W. 681, 684, a malicious prosecution action in which judgment for plaintiff was affirmed, the accused was discharged in the preliminary hearing before the magistrate. He was afterward in-

dicted by the grand jury, but this indictment was voluntarily dismissed by the county attorney. The court said: "The termination of the prosecution favorably to appellee made out a prima facie showing of want of probable cause. [Citing Wilson v. Lapham, 196 Iowa 745, 195 N. W. 235; Hidy v. Murray, supra; Krehbiel v. Henkle, 178 Iowa 770, 160 N. W. 211.] At this point it became necessary for appellant to meet this showing." Here the court set out the quotation from Hidy v. Murray, copied above.

Defendant concedes the principle by stating in his printed argument: "Although by the general rule the termination of the criminal case by the grand jury favorable to the appellee is sufficient to make out a prima-facie case of want of probable cause, the record as a whole may be such as to conclusively negative want of probable cause."

It is true, of course, that the prima-facie showing is rebuttable, and that is the reason the defendant is permitted to go forward with his evidence, but as held by this court it is "quite difficult, with the *prima facie* showing of want of probable cause" to take the issue from the jury.

In the case before us the defendant failed to go forward with his burden successfully. Under the entire record the issue of want of probable cause was definitely, for the determination of the jury.

■ . III. There was no burden on plaintiff to show "ill will," "hatred" or "express malice" on the part of the defendant. Malice may be shown from want of probable cause, or from a prima-facie showing thereof. As said, by quotation, in Connelly v. White, 122 Iowa 391, 393, 98 N. W. 144, 145:

"'Malice in law is where malice is established by legal presumption from proof of certain facts * * *. Malice in fact is to be found by the jury from the evidence in the case. They may infer it from want of probable cause. But it is well established that the plaintiff is not required to prove express malice, in the popular signification of the term, as that defendant was prompted by malevolence, or acted from motives of ill will, resentment, or hatred toward the plaintiff. It is sufficient if he prove it in its enlarged legal sense.'" On the same page this

court said: "The fact that the action was commenced and prosecuted without probable cause may be considered by the jury on the question of malice. *.* * The malice required to support the action may be inferred by the jury from want of probable cause."

For like pronouncements see Wilson v. Lapham, supra, 196 Iowa 745, 749, 195 N. W. 235, 237, where the court said: "The accusation of a crime, without probable cause, followed by an arrest and the consequent public exposure, is a matter of such a serious character as to justify an inference of malice therefrom." (Citing cases.)

See Parker. v. Parker, 102 Iowa 500, 503, 504, 71 N. W. 421, 422, where the court said:

"An intelligent being is presumed to do and act for some purpose, and, if he prosecutes another without reasonable cause for believing him guilty of the offense charged, his motives are the subject of just suspicion. * * * The jury are permitted to determine the purpose and design of the prosecutor from the circumstances attending the prosecution. These are sometimes such as to conclusively establish an honest purpose, but, ordinarily, the motive of the prosecutor is the subject of inference from want of probable cause."

See also Walker v. Camp, 63 Iowa 627, 631, 19 N. W. 802; Center v. Spring, 2 (Clarke) Iowa 393, 406, 407; Paukett v. Livermore, 5 (Clarke) Iowa 277, 280; Ritchey v. Davis, 11 Iowa 124, 127, 128; Shaul v. Brown, 28 Iowa 37, 45, 4 Am. Rep. 151; Jenkins v. Gilligan, 131 Iowa 176, 179, 108 N. W. 237, 9 L. R. A., N. S., 1087; Krehbiel v. Henkle, 152 Iowa 604, 606, 129 N. W. 945, Ann. Cas. 1913B 1156; Bishop v. Baird & Baird, 238 Iowa 871, 877, 29 N. W. 2d 201; Pierce v. Doolittle, 130 Iowa 333, 338, 106 N. W. 751, 6 L. R. A., N. S., 143; Wilson v. Thurlow, 156 Iowa 656, 659, 137 N. W. 956; White v. International Textbook Co., 144 Iowa 92, 98, 121 N. W. 1104; Krehbiel v. Henkle, supra, 178 Iowa 770, 780, 160 N. W. 211; Plecker v. Knottnerus, 201 Iowa 550, 554, 207 N. W. 574; Bair v. Schultz, 227 Iowa 193, 202, 288 N. W. 119.

IV. Probable cause has been said to be a mixed ques-

tion of law and fact. Johnson v. Miller, 63 Iowa 529, 538, 17 N. W. 34, 50 Am. Rep. 758. In Johnson v. Miller, 82 Iowa 693, 697, 47 N. W. 903, 904, 48 N. W. 1081, 31 Am. St. Rep. 514, it is said: "It is a mixed question of fact and law. The sufficiency of the circumstances to constitute probable cause is a question of law for the court, and the evidence of the circumstances is for the determination of the jury." Such is the holding in Center v. Spring, 2 Iowa 393, 407. The court has also said, and it may be the better statement, that "the question of probable cause may be one of law or one of fact," depending upon the circumstances in each case. Dickson v. Young, 208 Iowa 1, 6, 221 N. W. 820, 822; Bair v. Schultz, 227 Iowa 193, 200, 288 N. W. 119; Shaul v. Brown, 28 Iowa 37, 47, 4 Am. Rep. 151. In the last cited case Justice Cole said:

"Without entering at length into the discussion, we may remark that the question of probable cause in every case involves first the ascertainment of the facts from the evidence, and then the application of the law to the facts ascertained. This is precisely what is done in every case involving an issue of fact. Where the facts are conceded or few, or the evidence to establish them is brief, unquestioned and uncontradicted, the court has directly before it the basis upon which to rest its application of the law. But, where the facts are complicated and disputed, or the evidence to establish them is questioned and conflicting, the jury must find the facts."

In Bair v. Schultz, supra, 227 Iowa 193, 200, 288 N. W. 119, 122, we said:

" 'If the evidence shows conclusively that the prosecution was begun with probable cause, the question is one of law, and a verdict should be directed for the defendant.' [Citing Iowa decisions.] Except where the evidence is so clear and undisputed that all reasonable minds must reach the same conclusion therefrom, the question whether there is or is not probable cause must be determined by the jury. [Citing Iowa decisions.]"

We held it was a jury question in that case.

In Halligan v. Lone Tree Farmers Exchange, 230 Iowa 1277, 1282, 1283, 300 N. W. 551, 553, we said:

"We have concluded that the question of whether there was probable cause for the prosecution, under this record, was one of fact for the jury. The existence of probable cause is for the determination of the jury unless 'the evidence is so clear and undisputed that all reasonable minds must reach the same conclusion therefrom.' * * * We are justified in giving some weight to the conclusion of the trial court that the evidence was sufficient." .

 Defendant testified that he honestly believed when he signed and swore to the information that plaintiff had stolen the car. Such testimony was proper and competent but it is not conclusive. The important question was not his belief, but whether all of the facts, as he knew them or should have known, were such as to justify the ordinary, reasonably prudent, careful and conscientious person in reaching such a conclusion. A like contention was made in Shaul v. Brown, 28 Iowa 37, 46, 4 Am. Rep. 151, and this court said:

"This cannot be the law. No man's liberties or rights can thus be measured by even the honest belief of another. The honest belief of a person commencing a criminal prosecution against another, in the guilt of the accused is an essential element or fact for him in showing probable cause or in disproving the want of it; but he must also show [due] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in that belief, before his belief can become his vindication or shield. If he should show such ground and circumstances, and yet it was apparent that he did not himself believe in the guilt of the accused, they would not protect him."

 V. Defendant leans heavily on the defense that he stated his case fully and fairly to the county attorney and relied upon the latter's advice in starting and pursuing the criminal prosecution. The fact that defendant took such counsel before acting is not an absolute or conclusive defense. It may or may not rebut malice and want of good cause. To be a good defense the advice of counsel must have been sought in good faith, from honest motives and for good purposes, after a full and

fair disclosure of all matters having a bearing on the case, and the advice received must have been followed in good faith with honest belief in the probable guilt of the one suspected. As said in Johnson v. Miller, 82 Iowa 693, 696, 47 N. W. 903, 904, 31 Am. St. Rep. 514, "it is good faith that excuses from wrongfully commencing or continuing the criminal prosecution." Advice of counsel does not necessarily shield a person against a charge of malicious prosecution. Mesher v. Iddings, 72 Iowa 553, 554, 34 N. W. 328.

"If, however, the defendant misrepresents the facts to such counsel; if he does not act in good faith under the advice received; if he does not himself believe that there is cause for the prosecution or. action; * * * [and acts] in bad faith in originating and urging the prosecution; he will not be protected, and in such cases the integrity or *bona fides* of his conduct is a question of fact for the jury." Center v. Spring, 2 Iowa 393, 406.

In Bair v.. Schultz, supra, 227 Iowa 193, 201, 288 N. W. 119, 123, we quoted from Wilson v. Thurlow, 156 Iowa 656, 658, 137 N. W. 956, 957, as follows:

" 'Whether defendant in good faith acted on the advice of the county attorney is generally a question for the jury. White v. Textbook Co., 144 Iowa 92, 121 N. W. 1104. Advice of an attorney to constitute a good defense must be based on a full and fair statement of the facts within defendant's knowledge, and the advice must have been acted on in good faith and with the belief that there was good cause for the prosecution, and whether or not these things were done is a jury question.' [Citing decisions.]"

In Dickson v. Young, supra, 208 Iowa 1, 6, 221 N. W.. 820, 822, the court said: "Ordinarily, the question as to whether such disclosures were made in good faith and the advice of an attorney obtained are questions of fact, to be submitted to the jury." On this question in Wilson v. Lapham, supra, 196 Iowa 745, 750, 195 N. W. 235, 237, we said: "Obviously, this is ordinarily a question of fact ·for the jury." Other decisions holding as those above that defendant's good faith is a question for the jury are Gripp v. Crittenden, 223 Iowa 240, 249–251,

271 N. W. 599; Weisz v. Moore, 222 Iowa 492, 501, 502, 265 N. W. 606, 269 N. W. 443; Beard v. Wilson, 211 Iowa 914, 918, 919, 234 N. W. 802; Hepker v. Schmickle, supra, 209 Iowa 744, 229 N. W. 177; Charles City Plow & Mfg. Co. v. Jones & Co., 71 Iowa 234, 239, 240, 32 N. W. 280; Acton v. Coffman, 74 Iowa 17, 19, 36 N. W. 774.

The question of defendant's good faith in his defense of advice of counsel is a part thereof. He specially and affirmatively pleaded such defense and the burden was on him to establish such good faith. From the record there is ample support for a finding by the jury that defendant's object from the beginning was to get possession of the car. That is why he took the policy of insurance to the agent of the company. That was the first matter he stated to the county attorney, and when told that the state was not interested in recovering the car, but that a larceny charge might lie, the defendant promptly said "that's the charge I want filed."

Advice of counsel cannot be used as a subterfuge. As said by the eminent Chief Justice Shaw in Wills v. Noyes, 12 Pick. (Mass.), 324, 327, 328: "But even legal advice, if used only as a cover and not acted upon in good faith, if it does not induce an honest belief that the party has probable cause, will not screen him from the consequences of prosecuting an entirely groundless suit."

The Maryland court in Turner v. Walker, 3 Gill and Johnson 377, 386, 22 Am. Dec. 329, 334, said:

"But in an action for a malicious prosecution * * * it is not enough, as has been supposed, for the defendant merely to show that he acted under professional advice, the want of probable cause having been first established. He may have done that, and believed that he acted legally, and yet have acted maliciously, and for the purpose of oppression. And having acted maliciously and oppressively, and without reasonable or probable cause, his belief alone, that he acted legally, will not support him in his malicious and oppressive violation of the law. However far his taking professional advice would go, if standing alone, to show the absence of malice, and a desire to act legally and correctly; *yet it is evidence only to go to the*

580

*jury for that purpose, and may be rebutted by other surrounding circumstances, the whole of which should go to the jury."* (Italics added.)

We have quoted copiously from the record of conduct on the part of Ward and Earl Williams, and from testimony of the latter and others from which the jury could, and probably did, find that the primary desire and purpose of Ward and Earl was to possess the car lest they might be held liable for damages caused by its operation. Surely it was not to secure a seventeen-year-old Ford in which they had so little interest, and which plaintiff lacked so little of paying for in full. Certainly they could not have been actuated by so despicable a motive. But they were willing to have him thrown in jail in order to get the car. And then his conduct so embarrassed the defendant when he faced the relatives and wife of the plaintiff that he unfairly sought to place the blame on the insurance company and the county. He never denied this testimony.

■ The use of criminal process to effect a personal and private purpose is in itself evidence of defendant's lack of good faith in the prosecution. This court on several occasions has condemned such practices.

In White v. International Text Book Co., 156 Iowa 210, 221, 136 N. W. 121, 125, 42 L. R. A., N. S., 346, the court said:

"It is a universal rule that, if one makes use of the criminal law for some collateral or private purpose rather than to vindicate the law as to compel the delivery of property or the payment of a debt, such proceedings will be deemed to be malicious."

This language is quoted in Richmond v. Whitaker, supra, 218 Iowa 606, 611, 255 N. W. 681.

In Gripp v. Crittenden, supra, 223 Iowa 240, 250, 271 N. W. 599, 604, the court said:

"A prosecution induced by any desire other than to bring the accused to justice may be said to have been instituted through malice. So, in this case, if there was a want of probable cause, shown by the testimony, then the question of malice must be for the jury to determine. * * * It is for the jury to decide, ordi-

narily, whether or not the defendant Crittenden had an honest belief in the plaintiff's guilt. A state of mind is a fact like any other, to be proved by the testimony and surrounding circumstances."

· In State v. Roth, 162 Iowa 638, 653, 144 N. W. 339, 345, 50 L. R. A., N. S., 841, it is said: "We do not intend to hold that in all cases, under the removal law, advice of counsel would be a defense. It should not be used as a mere subterfuge." In Smith v. Howard, 28 Iowa 51, 54, a malicious prosecution case, the court said "it seems probable that the verdict was the result of a conviction on the part of the jury that he did not make a full and fair statement of the case, or that he made use of the machinery of a criminal process, to coerce the delivery of personal property, as to the title of which there was fair and just ground of controversy."

In Bishop v. Baird & Baird, 238 Iowa 871, 877, 29 N. W. 2d 201, 203, speaking of malice inferred from want of probable cause, we said:

"We conclude such inference would be permissible where, as here, one causes the impounding of another's wages for an asserted obligation found to have been fully satisfied. In this case there are other circumstances tending to indicate appellant's conduct was oppressive and malicious and we conclude the entire record warrants such a finding."

In White v. International Textbook Co., supra, 144 Iowa 92, 98, 121 N. W. 1104, 1107, the court said:

"Moreover, from the testimony that Crane threatened to cause plaintiff's arrest unless he paid the entire amount in connection with the circumstances of the settlement, the jury might have found that his design in resorting to the prosecution was solely to enforce payment. If so, a finding that he was actuated by malice necessarily would have followed."

In Potter v. Sims, 135 Iowa 739, 743, 111 N. W. 29, 30, the court said:

"If a criminal prosecution is not instituted for the purpose of enforcing the law alleged to have been violated, but for the

582

purpose of enforcing the collection of a claim or gaining some other private advantage or benefit, such fact is a direct impeachment of the good faith of the prosecution."

In Vorhes v. Buchwald, 137 Iowa 721, 725, 112 N. W. 1105, 1107, we said: "The law requires good faith on the part of the person making complaint, and if he does not prosecute for proper purpose the existence of facts which might have justified belief on his part of the existence of probable cause will not excuse him."

The conduct condemned in the above-noted cases adds further significance to the repeated visits of defendant to plaintiff's home after August 16 in his attempt to find plaintiff, in that on the last visit on Thursday, August 22, defendant made the covert hint and perhaps threat "that they didn't want to file against him." Defendant told the county attorney that Mrs. Schnathorst might not have told him the truth concerning plaintiff's whereabouts.

VI. We have stated herein that plaintiff had paid all of the car debt but less than one ninth thereof—an amount approximating his wages for a week. The fact that the amount was comparatively small as compared to the whole debt was a material factor in the case as bearing upon the alleged intent of plaintiff to steal the car. The fact that the amount was a comparatively inconsiderable sum also bore upon the good faith or lack of good faith of defendant, and on the issues of malice and want of probable cause. Whether the plaintiff, a comparatively young man with a wife and young children, under the circumstances would commit the crime of larceny was a matter for the consideration of the jury.

In Olson v. Neal, 63 Iowa 214, 215, 216, 18 N. W. 863, 864, the crime charged was willful trespass in taking a small quantity of firewood. Objection was made to evidence of the small sum which the defendant in the malicious prosecution action paid for the wood. In holding the evidence proper the court said:

"The facts of the transaction should be known, and the value of the timber which was the subject of the trespass was a material fact which would aid in determining the *animus* of

plaintiff in taking it, and the motive of defendant in instituting the prosecution. Men do not usually commit willful trespass, subjecting them to punishment, by taking property of inconsiderable value, nor do they in good faith, for the purpose of vindicating the law, institute prosecutions against others for such offenses where the injury is trifling."

The quoted language is apropos in this case.

In Parker v. Parker, supra, 102 Iowa 500, 504, 71 N. W. 421, 422, the court in a like situation said: "The court instructed the jury that the value of the timber claimed to have been carried away or destroyed might be considered in determining the animus of the plaintiff, and the motive of the defendants in filing the information." Judge Ladd then quoted the "apt words of Judge. Beck" in the Olson case, supra.

Defendant complains because the court submitted the case to the jury. The able trial court would have committed serious error had he failed to submit the case to the jury. The issues of malice, want of probable cause, and lack of good faith of defendant in seeking and following advice of counsel, and the verdict of the jury were each and all supported by ample evidence. The amount of the verdict was modest and defendant does not complain of its size.

VII. There is no merit in defendant's challenge to instruction No. 10. It was a full and fair charge. Defendant requested no instruction.

VIII. Neither is there merit in the assigned error respecting misconduct of the jury. A lady juror and other jurors during the trial went to their homes each night during the trial. One lady attended a social gathering at Lynnville, in the vicinity of which defendants formerly lived. Several of those at the party were discussing the case and made remarks adverse to the reputations and conduct of the defendants, and mentioned that they were giving plaintiff a "dirty deal." She told them she was a juror in the case and asked them to stop talking about it. When they did not desist she left the room. The next morning she remarked about the occurrence to another lady juror but did not discuss it. After the jury had agreed and the verdict had been signed and they were waiting

584

to report, she told the jury of the occurrence. The court had a hearing on the matter on affidavits and oral examination of the jurors, and ruled that there was no prejudicial conduct and no basis for a new trial.

We are abidingly convinced that the assigned errors do not justify a reversal.

The judgment is, therefore, affirmed.—Affirmed.

OLIVER, GARFIELD, MULRONEY, and HAYS, JJ., concur.

MANTZ, J., dissents.