IN RE ESTATE OF ANNA SPRINGER, deceased.

No. 50318.

(Reported in 110 N.W.2d 380)

AUGUST 15, 1961.

Westfall, Laird & Burington, of Mason City, and McMahon & Cassel, of Algona, for appellants.

Linnan, Lynch & Straub, of Algona, for appellee.

THORNTON, J.—This is a will contest. Anna Springer died, a resident of Kossuth County, May 19, 1959. She made the will in question here November 16, 1957, at which time she was just past the age of 83. This will was a republication of a will made May 18, 1955. She was a spinster. The will left $1000 to Clara Jones, one of contestants, provided for three other special bequests of $1000 and gave the residue to proponent, Joseph Williams. The stipulated value of the estate is $85,000. The proponent is a married man, 45 years of age, who had be-

friended the testatrix during her lifetime. He is not related to decedent. Contestants are four cousins of testatrix. They all live in Kansas.

On March 30, 1957, proponent was appointed guardian of the person and property of testatrix pursuant to section 670.5, Code of Iowa, 1954. On April 2, 1957, she fell and fractured her hip. She was taken to Holy Family Hospital at Estherville for treatment where she remained until June 20 when she was moved to a rest home at Burt, Iowa. Testatrix lived there until her death. While in the hospital, on May 7, 1957, testatrix executed a will leaving her estate to five of her Kansas cousins, four of whom are contestants here. Two of the cousins were visiting her at the time.

The trial court submitted the issues of testamentary capacity and undue influence to the jury. In addition to returning a general verdict for contestants, the jury answered special interrogatories on each issue in favor of contestants. Proponent filed a motion for a new trial because of the insufficiency of the evidence to support the verdict, misconduct of counsel in argument and, by amendment to the motion, misconduct of the jury foreman; and for judgment notwithstanding the verdict because of the insufficiency of the evidence and included all reasons stated in the motion for a new trial by reference. The trial court sustained the motion for judgment notwithstanding the verdict and entered judgment admitting the will to probate. Contestants moved for a new trial on the grounds of newly discovered evidence. This motion was overruled. At the request of counsel for both sides the trial court ruled on proponent's motion for a new trial. The court stated in its ruling, "* * * in order to complete the record which has been requested by counsel * * *," and it "* * * would have granted a new trial for all the reasons set forth in his ruling on the motion for judgment notwithstanding the verdict." The reasons stated in the ruling were directed solely to the issues of testamentary capacity and undue influence but the court did sustain each ground and paragraph of the motion for judgment notwithstanding the verdict separately and individually. In this state of the record we must consider the ruling on the motion

for a new trial because of misconduct of counsel and of the jury foreman as being adverse to contestants.

I. In view of the answers to the special interrogatories in favor of contestants, if the evidence on either issue is sufficient to support the verdict a reversal is required. In re Estate of Dashiell, 250 Iowa 401, 403, 94 N.W.2d 111. We believe from a careful consideration of the record there is sufficient evidence of lack of testamentary capacity to support the jury verdict and that the granting of a new trial because of misconduct of counsel or misconduct of the jury foreman amounted to an abuse of discretion and therefore the verdict of the jury must be reinstated.

II. In passing on a motion for judgment notwithstanding the verdict we must give contestants' evidence its strongest probative force. They are entitled to the benefit of all reasonable inferences to be drawn therefrom. However, substantial evidence, more than a scintilla, is necessary and it must rationally support a verdict in favor of contestants. Drosos v. Drosos, 251 Iowa 777, 103 N.W.2d 167; and Olsen v. Corporation of New Melleray, 245 Iowa 407, 60 N.W.2d 832.

III. The basic principles of law on testamentary capacity here applicable are well and concisely stated in In re Estate of Rogers, 242 Iowa 627, 630, 631, 47 N.W.2d 818, 820, as follows:

"Where this issue is involved the burden is upon the contestants to show lack of mental capacity of the testatrix in one of these respects: (1) To understand the nature of the instrument he is executing (2) to know and understand the nature and extent of his property (3) to remember the natural objects of his bounty, and (4) to know the distribution he desires to make. If his mental capacity is not equal to any one of these tests he cannot make a valid will. In re Estate of Meyer, 240 Iowa 1226, 37 N.W.2d 265; In re Estate of Ring, 237 Iowa 953, 22 N.W.2d 777; Perkins v. Perkins, 116 Iowa 253, 90 N.W. 55. Conversely, the law is slow to deny the right of any person to dispose of his property by will as he sees fit. No mere impairment of his mental or physical powers, so long as he retains mind and comprehension sufficient to meet the

tests above set forth, will render his will invalid. In re Estate of Sinift, 233 Iowa 800, 810, 10 N.W.2d 550, 554; Perkins v. Perkins, supra. And we have often said that there must be substantial evidence of mental unsoundness in order to generate a jury question. In re Estate of Sinift, supra; In re Estate of Fitzgerald, 219 Iowa 988, 996, 259 N.W. 455, 459.

██ "Also, the proof of mental deficiency must be applicable to the very time of the making of the will. Ipsen v. Ruess, 239 Iowa 1376, 1379, 35 N.W.2d 82, 85; In re Estate of Grange, 231 Iowa 964, 975, 2 N.W.2d 635, 641; In re Estate of Hayer, 230 Iowa 880, 884, 299 N.W. 431, 434. This is the question which must be determined, but in considering it, evidence of the condition of the testator's mind at other times, of his acts, expressions, appearance or statements may be received and submitted if there is a reasonable basis for the conclusion that they throw light upon the condition of his mind at the time of making the will. It is not essential that there be evidence of the exact date of execution of the instrument if there be something in the record from which it can be reasonably inferred what the state of his comprehension was when he made the will. In re Estate of Ring, supra; In re Will of Wharton, 132 Iowa 714, 718, 109 N.W. 492, 494."

See also In re Estate of Olson, 252 Iowa 471, 474, 106 N.W.2d 345, 346; and Drosos v. Drosos, 251 Iowa 777, 785, 103 N.W.2d 167, 171.

Rule 61, section 413, Wigmore's Code of Evidence, Third Ed., is:

██ "A person's prior or subsequent condition as to sanity or insanity is admissible to evidence his condition at the time in issue; the range of time depending on the circumstances of the particular case as to the kind of the alleged incapacity, its probable persistence, and the person's habits and health."

See also reference to senile dementia in Drosos v. Drosos, supra, at page 785 of 251 Iowa, at page 171 of 103 N.W.2d.

IV. In proponent's brief and argument there are cited two of our cases, In re Estate of Meyer, 240 Iowa 1226, 1234, 37 N.W.2d 265, 269, and In re Estate of Fitzgerald, 219 Iowa 988, 996, 259 N.W. 455, in each of which there is a misstate-

ment of the burden on contestant on the issue of mental capacity. The burden on contestant is there stated:

"* * * the burden is on the contestants to show that the testator did not have mind enough to know and comprehend, in a general way, the natural objects of his bounty, the nature and extent of his estate, and the distribution he wished to make of it."

This misstatement was pointed out by Chief Justice Garfield in his dissent in In re Estate of Meyer, supra, at page 1245 of 240 Iowa, at page 275 of 37 N.W.2d. As pointed out by the Chief Justice, the statement is misleading because it infers that in order to prevail contestants must establish testator's incapacity in all of these respects whereas proof of incapacity in any of them is sufficient. And the statement overlooks the fact testamentary capacity also involves ability to understand the nature of the instrument testator is executing. The dissent also points out the same misstatement in In re Will of Johnson, 201 Iowa 687, 689, 207 N.W. 748. To the extent such misstatement of the burden on contestants influenced the decisions in such cases they are in error.

V. The pertinent evidence on testamentary capacity is as follows: Dr. Thomas J. Egan, M.D., was called by contestants. His qualifications were waived by proponent. The evidence is Doctor Egan was admitted to practice medicine in 1931 and he has practiced in Bancroft since 1935. He has taken short courses to belong to the Academy of General Practice. The doctor testified he had known decedent professionally since 1936 in Bancroft. That he saw her 12 to 15 times a year up until she left Bancroft (apparently about 20 years ago). That he saw her in the early summer of 1957 (May 12, 1957, is the stipulated date) and his purpose was to endeavor to arrive at her mental competency. He gave her a casual physical examination, "* * * And then on in the questions were directed more to her mental condition * * * to attempt to evaluate her mental status." He testified the examination of decedent took 25 to 35 minutes, that decedent did not recognize him and it was necessary to tell her who he was twice during the examination, the first time he told her who he was it did not make

much of an impression. She knew she was in a hospital but she did not know which one. That he inquired about her property in Bancroft and Swea City and her farm. She was not sure of the occupancy or the tenants. She was not sure the rent or taxes had been paid. She was not coherent and logical on any subject except she was fairly coherent relative to the present condition of her injured hip. The doctor further testified that decedent was suffering from senile dementia. He stated, "It's actually arteriosclerosis or hardening of the arteries of the brain or childishness, * * *. Senile degeneration of the brain." In describing the condition he said, "Practically all functions of reasoning or memory, and all those functions of the higher centers of the brain are impaired." He stated the disease was a progressive one. That he saw decedent in the fall of 1957 and there was no change in her mental condition or capacity that he could determine. He gave his opinion a person suffering from senile dementia most probably would become a little worse in five months time. The doctor stated he was familiar with decedent's property in a general way. He was asked, "Had you not have suggested or told her of the property that she owned, in your opinion did she have the mental capacity to know what property she owned?" His answer, "I don't believe I am capable of answering it. I don't know whether she could or not." And he gave his opinion decedent was of unsound mind at the time of the examination. Doctor Egan further testified he reduced his conclusions to writing and gave them to Mr. Harold J. McNertney.

On cross-examination Doctor Egan testified he did not particularly pretend to be an expert on mental illness. That from his examination he came to the conclusion decedent was suffering from senile dementia. Because of the nature of the examination and what is claimed for it, the rest of Doctor Egan's cross-examination is set out as it appears in the record.

"Q. And many, many people who have suffered from senile dementia are perfectly competent, isn't that true? A. At times, perhaps.

"Q. Some of them at all times, isn't that right? A. I just don't quite understand what you're getting at—competent to—

1228

"Q. Let me rephrase the question. The mere fact that a person is suffering from senile dementia doesn't mean that they are of unsound mind, does it, Doctor? A. Not necessarily.

"Q. As a matter of fact, isn't it true that most people of advanced years are suffering to some extent from senile dementia? A. It's a rather strong term to use in that reference.

"Q. Well, you tell us what you— A. I would say they suffer from some impairment of judgment or impairment of memory or mental processes.

"Q. That doesn't necessarily make them people of unsound mind? A. Not necessarily, no."

Concerning Doctor Egan's testimony, Mr. McNertney, the lawyer who drew the 1955 will and its republication November 16, 1957, in question here, testified for proponent. He stated, he had Doctor Egan examine the decedent on May 12, 1957, to determine her mental competency. And that Doctor Egan told him decedent was incompetent to transact business, and he, Doctor Egan, said he would not express a legal opinion as to her incompetency to make a will, that was for the lawyers. Doctor Egan gave Mr. McNertney a written report on decedent's condition. The report was received in evidence and stated decedent was very confused and not at all like the shrewd businesswoman the doctor once knew her to be. Her memory was very defective, retention of information was only momentarily present. She was unable to tell the names of all of her tenants, if all her property was rented, or if the tenants were paying their rent. The concluding sentence of the report is: "The pattern was that [of] one of senile psychosis secondary to arteriosclerotic changes in her brain."

Mr. McNertney also testified decedent was of sound mind when she executed the will November 16, 1957. And that he went to the hospital on May 7, 1957, in response to a telephone call from proponent. He says he went to decedent's room and asked her if she had made a will, "She said she didn't know— signed something to get out of the hospital, but she didn't know what she signed." If believed, this testimony shows decedent wholly failed to comprehend the nature of the instrument she had signed that same afternoon.

Three lay witnesses for contestants expressed opinions as follows: Ernest N. Erickson, one of contestants, testified decedent was perfectly able to make a will on May 7, 1957, the day she signed a will in favor of contestants. Leo E. Fitzgibbons, the lawyer who drew the May 7th will, testified he talked with Doctor Clark, decedent's attending physician, on that date and the doctor told him there was no question but the decedent had the mental ability to make a will. This evidence was taken at a discovery deposition and introduced at the trial as part of the cross-examination of Mr. Fitzgibbons. It is not substantive evidence of what the doctor said, but only of what Mr. Fitzgibbons acted upon.

Another lawyer, Lawrence Winkel, testified he was called by Mrs. Fairbanks, the operator of the rest home, in June shortly after decedent was taken there, to come to the rest home and straighten out a misunderstanding between decedent and her guardian. The misunderstanding was, Joseph Williams contended he was decedent's guardian; decedent insisted she had no guardian. Mr. Winkel showed the guardianship file to decedent including her signature on the application. She said it looked like her signature, but she did not know how it got there. And Mr. Winkel quotes her as saying, " 'He's not my guardian; I didn't apply for appointment of any guardian. I don't need one and don't have any.' " He concluded his testimony on cross-examination that she knew what he was talking about and he thought she comprehended the matter and he would say she was one hundred per cent sound mind at the time. This testimony points out decedent wholly failed to remember signing the application for the appointment of a guardian or wholly failed to comprehend what she was signing. There is other evidence to the same effect.

Seven witnesses, old friends of decedent, persons who had known her from 20 to 50 years, testified decedent failed to recognize them, repeated herself in conversation, much of what she said failed to make sense, and that she did not comprehend. They also testified to her strong denial she was under guardianship and of her desire to leave both the hospital and rest home when her condition was such she obviously could not do so.

In all, 16 lay witnesses testified for proponent that decedent was of sound mind. And Dr. B. K. Bahnson, an osteopathic physician, testified he saw decedent professionally 14 times from June to December of 1957, that she was not suffering from senile dementia. That for her age she was more alert mentally than most people. That she was of sound mind on November 16, 1957, that he talked with her on that date and she told him she had signed a new or reaffirmed will.

The decedent was very deaf and most, if not all, conversation with her was carried on by writing notes.

VI. Contestants contend the evidence is sufficient and Doctor Egan was qualified as an expert. Proponent contends the medical testimony was insufficient to make a jury question, that Doctor Egan was not qualified to testify as an expert and that the record is totally devoid of any competent evidence of incompetency with reference to the time the will was executed.

A regular practicing physician is usually regarded as qualified to give an expert opinion of the mental condition of a patient under his care. Ward v. Sears, 247 Iowa 1231, 1239, 78 N.W.2d 545, 549; In re Estate of Van Dyke, 245 Iowa 942, 946, 65 N.W.2d 63; In re Will of Overpeck, 144 Iowa 400, 403, 120 N.W. 1044, 1045, 122 N.W. 928; Monahan v. Roderick, 183 Iowa 1, 13, 166 N.W. 725, 729; Miller v. Miller, 237 Iowa 978, 987, 23 N.W.2d 760, 765; In re Estate of Guinn, 242 Iowa 542, 47 N.W.2d 243; and Storbeck v. Fridley, 240 Iowa 879, 38 N.W.2d 163. It is our general rule that a physician need not be a specialist in the particular field in order to express an opinion as an expert. Shover v. Iowa Lutheran Hospital, 252 Iowa 706, 713, 107 N.W.2d 85, 89, and citations. See also Wigmore's Code of Evidence, Third Ed., section 585, paragraph (b)(2), page 131.

In 20 Am. Jur., Evidence, section 851, page 713, is this statement bearing on the qualifications of physicians to testify on the issue of insanity: "* * * According to the majority view, a physician or surgeon, although not a specialist in diseases of the mind, is competent to testify as an expert on matters of insanity, based either upon his personal observation or upon a hypothetical state of facts. Under this view a general medical

practitioner is as competent to testify to the sanity of a person as the skilled expert who devotes his entire practice to the care of such diseases. In some jurisdictions the rule is established that a physician or surgeon must qualify as a specialist in order to testify upon the issue of insanity, except where he was the attending physician or, at least, had ample opportunity of examining and treating the patient."

In Ward v. Sears, supra, the medical doctor made two professional calls on the decedent shortly before the will in question was executed. He was asked by the police to see her. It is safe to say the purpose of his calls was to determine her mental condition and arrange for proper care. We there held the opinion testimony of the doctor was admissible and the jury properly could have given it substantial weight. In In re Estate of Cooper, 200 Iowa 1180, 1183, 206 N.W. 95, relied on by proponent, the doctor, a general practitioner, had at one time been called to wait upon decedent for some physical ailment, but at no time had he paid any professional attention to decedent's mental condition. He had only observed him on the street or in his business. There we held the doctor's testimony did not rise to the dignity of expert testimony.

The foregoing authorities point out that the reason behind the rule allowing a general practitioner to testify to mental condition of a patient under his care is that he had ample opportunity to professionally observe and examine the patient. Where, as here, the general practitioner has such opportunity the objection he is not the attending physician is no longer valid.

VII. Cases involving faulty hypothetical questions are not helpful except to point out the opinion of the expert rises no higher than the level of the evidence and the logic on which it is predicated. In re Will of Grahlman, 248 Iowa 535, 81 N.W.2d 673. And it is true the testimony of an expert may be destroyed by cross-examination showing the decedent actually possessed the four elements of testamentary capacity. Bales v. Bales, 164 Iowa 257, 272–275, 145 N.W. 673. However, that is not true of the cross-examination of Doctor Egan. The cross-examination set out above does not reach that point;

all it does is to say some people suffering from senile dementia are competent at times and not all are of unsound mind, and that most people of advanced years suffer some impairment of judgment, memory or mental processes. This cross-examination was not directed to decedent's condition and does not destroy, or in fact does not weaken, the testimony on direct examination that decedent was suffering from senile dementia, that it is a progressive disease, and she was of unsound mind at the time of the examination. The fact Doctor Egan was unable to say whether decedent knew what property she owned does not render his testimony as an expert inadmissible or place it on a basis showing decedent did have testamentary capacity. In re Estate of Guinn, 242 Iowa 542, 47 N.W.2d 243.

The testimony of Doctor Egan also relates to the time of drawing the will, November 16, 1957. His testimony is clear the disease is progressive, that it may be arrested but not cured, and that when he saw decedent in the fall of 1957 there was nothing he could determine which would cause him to change his opinion. Where, as here, the disease is shown to be progressive it is not necessary that the observations upon which the opinion of an unsound mind was based were had at the time the will was executed or immediately before. Ward v. Sears, 247 Iowa 1231, 1238, 78 N.W.2d 545; In re Estate of Rogers, 242 Iowa 627, 631, 47 N.W.2d 818; and Wigmore's Code of Evidence, Third Ed., rule 61, section 413.

We hold the testimony of Doctor Egan was properly received as expert testimony, it was such as to have substantial bearing on the mental condition of decedent at the time the will was executed, and the jury could properly give it substantial weight.

▮▮▮ VIII. In addition to Doctor Egan's testimony, the testimony showing decedent either did not remember or did not comprehend the nature of the instrument she signed on May 7, 1957, and her denials of signing the application for the appointment of the guardian, In re Estate of Fitzgerald, 219 Iowa 988, 995, 259 N.W. 455, 458, together with the circumstances of the appointment of the guardian, constitute substantial evidence bearing on decedent's testamentary capacity.

Ward v. Sears, 247 Iowa 1231, 1241, 78 N.W.2d 545. The fact decedent was under guardianship does not in this case raise a presumption of incompetency and make a case for the jury on that ground alone as contended by contestants. This was a voluntary guardianship under section 670.5, Code of Iowa, 1954, and no presumption is raised. Olsson v. Pierson, 237 Iowa 1342, 1347, 25 N.W.2d 357, 360.

IX. Proponent also contends the fact contestants did not call the attending physician, Doctor Clark, militates against them. This is true as to the weight to be given the testimony produced by the trier of fact. But it is not true that such failure prevents contestants from making a case for submission to the jury by other substantial evidence. This court often uses such failure to produce or interrogate witnesses as means to determine the weight to be given evidence produced when this court sits as a trier of fact. Bowles v. Bowles, 248 Iowa 930, 937, 81 N.W.2d 15, 19; and Renze v. Renze, 247 Iowa 25, 31, 72 N.W.2d 490, 493. And to demonstrate the lack of substantial evidence and its logical source in determining the sufficiency of evidence to make a submissible case. In re Estate of Olson, 252 Iowa 471, 480, 106 N.W.2d 345, 350; In re Estate of Burrell, 251 Iowa 185, 100 N.W.2d 177; and Edwards v. Des Moines Transit Co., 251 Iowa 163, 169, 99 N.W.2d 920, 923.

X. One of the grounds urged by proponent for a new trial is misconduct of counsel for contestants in argument. Counsel for contestants was pointing out the dual employment of the lawyer, who drew the will in question here, that he represented or was employed by both proponent and decedent and had reached the point of saying such lawyer was in an inconsistent position when he was stopped by counsel for proponent. The objection was there was no conflict of interest and it was improper argument. The court's ruling was:

"I do think that you are possibly going a little far in some of that. I suggest you confine yourself. Nothing has been shown as conflicts in the evidence. I do not think you should go into that any further, please."

Actually counsel for proponent anticipated the argument.

1234

As we read the portion of the argument set out, the point of improper argument, if such it was, had not been reached. Apparently, at the time, counsel for proponent and the trial court so viewed it. Proponent received all he asked in the ruling of the court. He did not at the time think the argument was so prejudicial as to warrant asking a mistrial, Auen v. Kluver, 250 Iowa 619, 626, 95 N.W.2d 273, 277, or even an instruction to the jury to disregard such argument. In this we think he was correct. Agans v. General Mills, 242 Iowa 978, 984, 985, 48 N.W.2d 242, 246.

To warrant the trial court in granting a new trial because of misconduct in argument it must appear prejudice resulted or a different result would have been probable but for such misconduct. Johnson v. Kinney, 232 Iowa 1016, 1027, 7 N.W.2d 188, 144 A. L. R. 997.

XI. The evidence taken on the issue of misconduct of the jury foreman shows the foreman with his wife drove to the place of business of Joseph Kemna, a car dealer, for the purpose of having Mrs. Kemna, a notary public, notarize an insurance paper. This was on a Saturday afternoon during the trial and before the proponent Joseph Williams testified. While Mrs. Kemna took the paper to a lawyer, the juror, his wife and Mr. Kemna engaged in conversation in Mr. Kemna's place of business and had a cup of coffee in a cafe. The record indicates they were together about 30 minutes on this occasion. Mr. Kemna and the foreman were friends and had gone water skiing and fishing together a number of times. During the conversation the name of proponent, Joseph Williams, came up. Mr. Kemna says he does not know how it came up. The foreman says his wife brought it up, that he did not talk about proponent but his wife and Mr. Kemna did in his presence and hearing and that such conversation took place only in the garage and not in the cafe. He says he told them he was a member of the jury and did not want any part of this. The strongest possible inference from the testimony of Mr. Kemna and the jury foreman, the only witnesses called, is that Mr. Kemna referred to proponent as a con man, that he was after decedent's money but he was the only one that treated her

white and he was entitled to something from the estate. The foreman testified positively that the conversation did not influence him and that he did not discuss the conversation with the other jurors. And he testified that on the first ballot taken by the jury the vote was eleven to one for the verdict that was finally returned for contestants. Though the jury foreman should have refused to listen to any discussion relative to a party to the action, it is apparent the result was not influenced.

There were two questions presented to the trial court on the foregoing evidence, 1st, was there misconduct on the part of the juror, and 2d, if there was misconduct did it affect the substantial rights of the parties, i.e., was the verdict the result of such misconduct? There is evidence of misconduct, at least listening to the conversation when he could have avoided it, but not that he joined in or assented to it. But there is substantial evidence the substantial rights of proponent were not affected; the evidence relative to the first ballot shows this. There is no evidence to the contrary. It was something other than the conversation overheard by the foreman that influenced the other jurors. Here the failure to call other witnesses apparently available, commented on above, comes into play. If either side was not satisfied with the record as made, additional jurors could have been called.

This is not a case where the record shows a number or more than one of the jurors was subjected to the influence of outside evidence or opinion, as in Hawkins v. Burton, 225 Iowa 1138, 1145–1147, 281 N.W. 790; In re Estate of Merrill, 202 Iowa 837, 841, 211 N.W. 361; and Cresswell v. Wainwright, 154 Iowa 167, 186, 134 N.W. 594. Nor is this a case where one who was not a member of the jury slept in the same room with the jurors and had conversations concerning plaintiff's character with one or more jurors, as in Welch v. Taverner, 78 Iowa 207, 42 N.W. 650. And it is not one where documents not admitted into evidence but containing matter bearing on the question to be determined were taken to the jury room and considered by the jury. McLeod v. The Humeston & S. Ry. Co., 71 Iowa 138, 32 N.W. 246. Nor one where a juror and defendant rode to defendant's home during the noon hour and had dinner to-

gether. Lynch v. Kleindolph, 204 Iowa 762, 216 N.W. 2, 55 A. L. R. 745. And this case differs from Perry v. Cottingham, 63 Iowa 41, 42, 18 N.W. 680, wherein there was an affidavit by one having a conversation with a juror during the progress of the trial showing statements by the juror that he had then made up his mind on the outcome of the case.

The facts of this case more closely resemble those in Schnathorst v. Williams, 240 Iowa 561, 583, 36 N.W.2d 739, 10 A. L. R.2d 1199, wherein a lady juror attended a party during the trial where several persons made remarks adverse to the reputations and conduct of the defendants. The juror advised such persons she was a juror and asked them to stop talking about it. When they did not, she left the room. She advised another juror of the incident but not the details. On the hearing on the matter the trial court ruled there was no prejudicial misconduct and we affirmed.

XII. Proponent vigorously urges the wide discretion vested in trial courts in granting a new trial, and that we only reverse on a clear showing of abuse of discretion. Krieg v. Grant, 248 Iowa 396, 80 N.W.2d 724. This is true. But the trial court's discretion is not unlimited. As pointed out in Jacobsen v. Gamber, 249 Iowa 99, 102, 86 N.W.2d 147, 149, it is a legal discretion, and can be exercised only for sound judicial reasons based upon the record. Here we hold the trial court was in error in its ruling that it would have granted proponent a new trial. As has been pointed out there was sufficient evidence in the record to sustain the jury's verdict on the issue of testamentary capacity. The misconduct of counsel claimed, if it existed at all, was so slight no possible prejudice could have resulted to proponent. And we can find no evidence the verdict of the jury was the result of the misconduct of the jury foreman.

What has been said disposes of proponent's contentions that a new trial should be granted where one ground alone is not sufficient, yet when taken with other grounds is sufficient, and that a new trial should be granted if substantial justice has not been effected. None of the grounds here urged has merit as above pointed out.

The case is reversed and remanded with directions to reinstate the verdict of the jury.—Reversed and remanded.

All JUSTICES concur.