WILLIAM C. MINARD, appellant, v. BOSS HOTELS COMPANY et al., appellees.

No. 47466.

(Reported in 40 N.W.2d 276)

Appeal from Polk District Court.—O. S. FRANKLIN, Judge.

DECEMBER 13, 1949.

REHEARING DENIED MARCH 10, 1950.

Steward & Crouch, of Des Moines, and Lee B. Primus, of Minneapolis, Minnesota, for appellant.

Evans, Riley, Duncan, Jones & Hughes, of Des Moines, for Boss Hotels Company, Hotel Savery, Edwin A. Boss, and Ethel M. Boss, appellees.

Kent Emery, of Des Moines, for E. Arthur Johnston, appellee.

HAYS, C. J.—Action for damages for a malicious prosecution. There was a directed verdict for the defendants, and plaintiff· appeals.· The sole question presented here is: "Is there sufficient evidence to submit to a jury the question of whether or not the appellees instigated or procured the criminal prosecution of the appellant?" This issue being primarily factual we must examine the facts in the light most favorable to appellant. Lawson v. Fordyce, 234 Iowa 632, 12 N.W.2d 301; Comfort v. Continental Casualty Co., 239 Iowa 1206, 34 N.W.2d 588.

On January 3, 1946, appellant was arrested under a Federal warrant which charged him with theft from the United States mail. The complaint was signed by Cloid I. Level, assistant United States district attorney.

On January 4, 1946, an information was filed in the Des Moines Municipal Court charging appellant with obtaining money by false pretenses from the Boss Hotels Company. This information was signed by C. P. Donovan, a United States

postal inspector. This charge was dismissed February 15, 1946, at the request of the said Donovan.

On April 24, 1946, the Federal grand jury returned three indictments against appellant. In one, he was charged with uttering a forged United States money order. In another, by Count I, he was charged with altering a United States check, and by Count II, with uttering the same. The third indictment charged him with the theft from the United States mail of a $50 check, payable to one Mary Jane Toom, while Count II charged the theft of a check from the mail, payable to one Mary B. Horton. On November 21, 1946, all three indictments were dismissed by the court upon the recommendation of the district attorney.

The facts and circumstances surrounding the issuing of the complaint by Mr. Level, the information in municipal court by Mr. Donovan, and the three indictments, particularly Count I of the third indictment mentioned above, all of which are in some degree connected with the Toom check, furnish the basis for this action.

Appellant, an honorably discharged veteran, was during the time in question residing at the Brady Apartments in Des Moines and employed at the United States Employment Service (USES). Appellees Boss Hotels Company and Edwin A. Boss and Ethel M. Boss, a corporation and a partnership, were the owners and operators of Hotel Savery in Des Moines; appellee E. Arthur Johnston was the assistant manager of Hotel Savery.

Donovan was investigating a series of mail thefts, which began coming to light in July 1945, which checks, after being altered, were cashed at various stores in Des Moines. Between October 1 and December 1 Younker Brothers and the Utica cashed several checks which had been stolen from the mail and which bore the forged endorsement of William C. Minard. In each instance the person who O.K.'d the check wrote thereon the means of identification used, which was a photostatic copy of the William C. Minard discharge from the armed services. In all, eleven of the checks brought to the attention of Mr. Donovan bore the endorsement of a William C. Minard.

In October, Mr. Donovan learned that a William C. Minard —appellant—lived in an apartment where two checks had been

taken from the mail. He talked with the custodian of the apartment about Minard's habits, and also with Mr. Hagadorn, appellant's immediate superior at the USES. From him he obtained samples of his handwriting and also a list of his absences from work. Mr. Donovan testified that he contemplated talking with Minard just before Thanksgiving, but, at the request of Mr. Hagadorn, he consented to wait until after the holiday; that he was then called to Detroit, returning to Des Moines just before Christmas, and was busy with Christmas mail until the first of the year. He also stated that he had, prior to January 1946, discussed the matter at least four times with Mr. Level and given him all available information.

On December 20, 1945, a check was presented to appellee Johnston at Hotel Savery for his O.K., which was given, and the check cashed by the cashier. The check was dated December 18, 1945, drawn upon a Pella bank in the sum of $50, and signed by one Chas. Toom. The payee named therein was William C. Minard. The check was later returned, it appearing that the name of the original payee, Mary Jane Toom, had been removed and the name of William C. Minard inserted. The check was endorsed "William C. Minard" when cashed. The party presenting the check for payment wore a masonic ring and presented a photostatic copy of appellant's discharge from the service. Mr. Whalen, manager of Hotel Savery, learned from the bank that many checks had been stolen from the mail and that some, when cashed, bore the name of William C. Minard as payee or endorser. He discussed this check with two Des Moines detectives, Dawson and Fitzpatrick, and later gave them the check, as it might be useful in running down the mail thefts. Mr. Donovan was advised of the check by the detectives. It was not known by appellee Johnston that the check had been given to the federal authorities.

On January 3, 1946, Donovan went to Hotel Savery and discussed the check with both Johnston and Whalen. He informed them that a man by the name of William C. Minard lived in Des Moines and was employed at the USES. Appellee Johnston, as a witness for appellant, stated, "The morning of the 3rd, Mr. Donovan, the postal inspector, came to the hotel. Mr. Whalen and Mr. Donovan came to my office and I was asked if I could

identify the person who wrote this—or cashed this check, and I said that I could, and I gave a description—"; he was asked to go to the USES and see if he could identify Minard as the man who cashed the check; that he went to the USES, picked an individual out of a group of men in the room as the man who cashed the check, which man was appellant; he phoned to Mr. Donovan at the hotel, told him he had identified his man and was told to talk with him about the check, which he did; he then returned to the hotel and again told Donovan that he had found the man.

Donovan went to the USES where he called appellant into Mr. Hagadorn's office and told him he was investigating some mail thefts; said that he had information which made it necessary to discuss the matter with him. At Donovan's request, appellant went to the Post Office building, where he was questioned by Donovan and by the two detectives who had been working on the case with him. Appellant was later taken to Mr. Level's office, where he was again questioned. Mr. Level then directed the filing of mail theft charges against him, and also suggested that charges might be filed in the municipal court. Appellee Johnston later appeared before the Federal grand jury, in response to a subpoena and again reiterated his identification.

The above facts are substantially undisputed, except as to what happened at the USES at the time Johnston appeared and identified appellant. Appellant states that just before Johnston talked with him someone called for Bill Minard, to which he answered that he was Minard (it is not claimed that the party who called was Johnston); that immediately thereafter Johnston told appellant he wished to talk with him; that he showed him the check and said " 'you are the one' " and that he wanted his money; when told by appellant that he knew nothing about it, he said " 'I am not going to pay for this, by God someone is' ", and left. The record also shows that Mary Jane Toom, original payee in the check in question, resided in the same apartment building as did appellant; that on the day the check was taken from the mail the list of absences from work given to Donovan showed appellant was not absent; that appellant had at some prior date obtained some photostatic copies of his discharge, and was unable to explain how it had been obtained by other parties.

Mr. Level, as a witness, stated that he had consulted with

Donovan many times concerning the mail thefts and Minard's connection therewith; that the decision to file the complaint was not reached on the information of any one person or any one fact; that he is the one who decides whether or not charges are to be filed, and that in view of the information given him by Donovan, together with his own questioning of Minard, it was his judgment at that time that a complaint should be filed.

Appellant's case is based upon the theory that the identification by Johnston was the proximate and efficient cause of the prosecution. It is true that this was a link in the chain of circumstances which came to the attention of the authorities, but the record shows, without dispute, that the climax had been reached prior to the identification. Mr. Level testified that prior to January 3, 1946, he had notified Donovan that "the time had come to talk with Minard and let him explain the situation. That means unless he explained it away he will be charged."

The record shows a criminal prosecution, that it had been terminated by the discharge of the defendant, and we assume, without deciding, that it shows a want of probable cause and that the prosecution was malicious.

 It is conceded by all parties that it is essential in this type of litigation that the prosecution was procured or instigated by the defendant. As stated in 54 C.J.S., Malicious Prosecution, section 14, "defendant must have been the proximate and efficient cause of maliciously putting the law in motion in the original proceeding." Restatement of the Law, Torts, section 653, comment g, states:

"In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated expressed by direction, request, or pressure of any kind was the determining factor in the official's decision to commence the prosecution or that the information furnished by him upon which the official acted was known to be false."

In Bair v. Shoultz, 233 Iowa 980, 983, 7 N.W.2d 904, 905, this court said:

"In an action for malicious prosecution the question of whether the defendant was the instigator or moving cause of

the prosecution is the same in each case. It matters not that the defendant did not sign an information and cause the arrest. It is sufficient if *his voluntary participation* in the prosecution starts the movement of the criminal machinery so that an arrest would probably follow." (Italics added.)

In Holden v. Merritt, 92 Iowa 707,709, 61 N.W. 390, 391, we said:

"If [defendant], *on his own motion,* gave information or made complaint to the officers of the law in such a manner as that, in the regular and ordinary course of events, an arrest must be made or will probably follow, this is sufficient to warrant the jury in finding him [to be] the real prosecutor." (Italics added.)

With these rules we agree, but under the facts in the instant case they are of no assistance to appellant. The record shows without contradiction, by inference or otherwise, that appellees' only connection was the giving of the check to the detectives by Mr. Whalen, manager of Hotel Savery, and the identification of appellant by appellee Johnston, which identification was undertaken and made at the request of the postal inspector, Donovan. There is not a word in the record to show that any of the appellees or Mr. Whalen asked that the authorities investigate this particular matter; that they knew that the inspector went to the USES and took appellant to the Post Office building, or that charges were filed against him by either Donovan or Level.

Appellant cites Wilson v. Thurlow, 156 Iowa 656, 658, 137 N.W. 956, 957, which is a case of mistaken identity, as is the instant case. The facts in that case are vastly different than here, and this court there said: "Before commencing a criminal prosecution, the accusing person must use the means which an ordinarily reasonable and prudent man would exercise to learn the facts." The court then states that there was evidence which tended to show that the charge was recklessly made. We do not find such a situation in the instant case. The only possible basis for claiming that appellee Johnston acted other than in good faith and with reasonable prudence is the statement, alleged by appellant to have been made by him at the USES, "I am not going to pay for this, by God someone is." While this might be

very material upon the question of malice, which is not before us, it certainly does not go to the extent of showing that Johnston willfully and falsely identified him to Donovan, especially in the light of the other facts and circumstances appearing in the record.

We believe that the correct view to take of the instant case is found in Campbell v. Yellow Cab Co., 3 Cir., Pa., 137 F.2d 918, 921, 924, which was a mistaken-identification case. There a taxi driver in response from a summons by police identified the plaintiff as a robber, believing him to be such, but did nothing further to influence the police in the criminal prosecution subsequently taken. It was held that he was not the "instigator" of the prosecution. The court said, "his sole role was to identify the plaintiff as one of the robbers. He at no time took the initiative. He at no time, either expressly or by indirection, directed, requested or exerted any pressure upon the police to proceed with the prosecution." It also said, "the interests of society require that a citizen who performs his duty in assisting the public authorities to apprehend and prosecute criminals shall not be penalized for a mere error in so doing." See also King v. Martin, 150 Va. 122, 142 S.E. 358.

We realize that, as a general rule, the question of the defendant being the real prosecutor is one for the jury. We also recognize the fact that the question before us is not whether they did instigate the prosecution, but whether there is sufficient evidence in this record to warrant a jury in so finding. We are satisfied that under this record the trial court was correct in directing a verdict for the appellees, and that the judgment of the trial court should be affirmed.

The court being equally divided the case stands affirmed by operation of law.—Affirmed.

HALE and WENNERSTRUM, JJ., concur.

MULRONEY, J., specially concurs.

MANTZ, GARFIELD, OLIVER, and BLISS, JJ., dissent.

SMITH, J., takes no part.

MULRONEY, J. (specially concurring)—I concur in the opinion of Chief Justice HAYS. All authorities agree that a private person is liable in a false-arrest case for the harm suffered by the innocent person if (1) the private person initiated or procured the institution of the criminal proceedings (2) if the criminal proceedings were initiated without probable cause or primarily for some purpose other than bringing an offender to justice, and (3) if the criminal proceedings have terminated in favor of the accused. Restatement of the Law, Torts, section 653. A false-arrest case is materially different from other tort actions where the injury has resulted from negligence, either actionable or contributory. A mere statement of the above rules governing a false-arrest case shows that in this type of action as against a private person, there is a wide area for damage without wrong. The "innocent" person is just as much harmed if he fails to show the proceedings were initiated or procured by the private person or if he fails to show want of probable cause in the private prosecutor or if he fails to show termination of the proceedings in his favor. Such damage is one of the incidents of life in organized society. It is part of the price all citizens pay for the benefits of government.

In the introductory note to chapter 29, Restatement of the law of Torts, it is said of these restrictions that the law imposes in a false-arrest case against a private person that they "represent an adjustment between two highly important social interests. The first is the interest of society in the efficient enforcement of the criminal law, which requires that private persons who aid in the enforcement of the law should be given an effective protection against the prejudice which is likely to arise from the termination of the prosecution in favor of the accused. The second is the interest which the individual citizen has in being protected against unjustifiable and oppressive litigation of criminal charges, which not only involve pecuniary loss but also distress and loss of reputation."

The very first restriction imposed upon recovery for wrongful prosecution of a criminal proceeding is the burden placed upon the plaintiff to prove the criminal proceedings were either initiated by the defendant or the defendant procured the institution of the criminal proceedings. Here it is clear the de-

fendants did not initiate the criminal proceedings, since the sworn charge was made by the Federal officer, so the only question is whether the defendants procured the institution of the criminal proceedings. In Restatement of the Law, Torts, section 653, comment b, the rule is stated:

"A person who does not himself initiate criminal proceedings may procure their institution in one of two ways: (1) by inducing a third person, either a private person or a public prosecutor, to initiate such proceedings, or (2) by prevailing upon a public official to institute them by filing an information. It is, however, not enough that some act of his should have caused the third person to initiate the proceedings. One who gives to a third person, whether public official or private person, information of another's supposed criminal conduct or even accuses such other thereof, causes the institution of such proceedings as are brought by the third person. The giving of the information or the making of the accusation, however, does not constitute a procurement of the proceedings which the third person initiates thereon if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit."

I will not review the facts, already canvassed at length in the majority and dissenting opinions. To me they amount to no more than that the defendant Johnston gave the Federal officer certain information which, with other information already known to the officer, may have "caused" the officer to institute criminal proceedings on this and other alleged crimes, but the officer, in the words of the above rule, was "left to the uncontrolled choice * * * to bring the proceedings or not" as he saw fit. One cannot say from this record that the officer was "prevailed upon" by defendant to file the information against plaintiff, nor can we say the defendant procured the institution of the criminal proceedings by the part he played in the officer's investigation that preceded the filing of the information. To hold otherwise would, it seems to me, render a serious blow to criminal investigation. So often the victim is the only person who saw the criminal at the time of the commission of the crime. If he is to be liable, at his peril, when later asked by the officers if he will identify a suspect, then officers will in the future receive little

co-operation from civilians in their war against crime. Sometimes the officers' investigation of a suspect precedes the identification by the victim, sometimes it follows such identification. It should make no difference as far as the question of initiating the criminal proceedings is concerned. Suppose in this case the officers knew nothing about plaintiff at the time Johnston identified him as the man who passed the check. Afterwards they learned other stolen checks with his name had been passed. They procured a copy of plaintiff's handwriting and learned from a handwriting expert that the endorsements on the other stolen checks were similar to plaintiff's handwriting. They learned that two of the stolen checks were taken from the mailbox in the apartment house where plaintiff lived. They learned from other victims that plaintiff's discharge was used in each instance as a means of identification. They called plaintiff to the district attorney's office, question him, and then the officer without again consulting the original victim files an information. Could anyone think the original victim who made the identification—later proved to be a mistake—initiated or procured the institution of the criminal proceedings and is liable for damages for the harm caused by the criminal proceedings that the officers filed? I think not. And yet that is this case with the identification preceding the investigation by the officers.

I share Justice Mantz's feeling of sympathy expressed in his dissenting opinion. My study of the record convinces me that harm has been done to an innocent young man. He has felt the heavy processes of the Federal law—arrest and imprisonment. But I think his case falls in that area of damage without wrong of this defendant under the first restriction in a false-arrest case. In that area juries have no function to perform. But in that area Governments, and notably the Federal Government, have made requital by private acts. It is my fervent hope that if and when plaintiff seeks recompense by such proceedings, as the innocent victim of the Government's charge, that his claim receive favorable consideration. The officers admit they initiated the proceedings. I think the record shows they were entirely without blame. But the fact remains they prosecuted an innocent man. His claim should appeal to the conscience of the Government that prosecuted him.

MANTZ, J. (dissenting)—I respectfully dissent.

The action was at law and for malicious prosecution. When both sides rested the court sustained a motion for a directed verdict made by the defendant, sustaining it on the sole ground that the plaintiff's evidence failed to show that the prosecution was instigated by the defendants. In so ruling the lower court held that as a matter of law plaintiff, in that particular, had not made out a case sufficient to warrant a submission to the jury. The court stated that it was not necessary to pass upon the other grounds of the motion. The issue thus raised depends upon the facts and in passing thereon the evidence must be viewed in the light most favorable to appellant. Many cases might be cited to sustain that rule. The late case of Lawson v. Fordyce, 234 Iowa 632, 12 N.W.2d 301, reaffirms that rule and cites many cases supporting it.

As I study the majority opinion in the light of the record its effect will be as follows: A peaceable and law-abiding citizen, one with a family, who served his country for over three years in the late war and who still suffers from disabilities incurred therein, who was honorably discharged, who shortly after his return to the United States was given a responsible position in the United States Employment Service (USES), who worked there without criticism or complaint, who, while so employed, was falsely and publicly accused of the specific crime of obtaining money under false pretenses, was arrested and incarcerated for a period of nine days, was humiliated and embarrassed by being taken in public, handcuffed, was indicted upon said charge, was later released upon bond and who expended approximately $450 in proving his innocence, who was not tried, and the charges were dismissed after the authorities became convinced of his innocence, the reason given being "mistaken identity", is entitled to sympathy and nothing by way of damages.

The essence of the holding in the majority opinion is set forth in the concluding paragraph thereof:

"We realize that, as a general rule, the question of the defendant being the real prosecutor is one for the jury. We also recognize the fact that the question before us is not whether they did instigate the prosecution, but whether there is sufficient evidence in this record to warrant a jury in so finding. We are sat-

isfied that under this record the trial court was correct in directing a verdict for the appellees, and that the judgment of the trial court should be affirmed."

The majority opinion sets forth many of the facts involved as shown by the record. For the most part they are substantially as there set forth. We disagree, however, with the conclusions which the majority opinion has reached in considering them.

From the evidence set forth in the record it is crystal clear that the authorities, state and Federal, knew of various similar crimes being committed prior to, at, and after the particular one for which appellant was charged; they knew of appellant and his employment; they knew that months before his arrest various instruments of credit, checks, drafts, and money orders had been stolen from the mailboxes and that such were altered by changing the name of the payee, or forging endorsements, and that when appellant was arrested the authorities had at least ten such instruments in their possession in all of which appellant's name "William C. Minard" had been either unlawfully inserted or had been forged, or both. The first check bearing appellant's forged endorsement was cashed in September 1945, and the postal authorities knew of this shortly thereafter. For the most part the crimes followed a similar pattern—checks and drafts stolen, altered, names changed and forged, and then cashed at various places in Des Moines. Both the Federal and state officers long knew of such conditions—knew that William C. Minard was an individual, his employment, his residence. Such officers cooperated in their work and were in almost daily contact. The FBI had interviewed appellant and made a report to the Federal Postal Inspector, C. P. Donovan. Donovan had made inquiries as to the habits and surroundings of appellant, and in fact made a sort of personal surveillance of him. During the time Donovan was investigating the matter he had appellant shadowed or followed for about a year and a half to see whether or not he was the man who was robbing the mailboxes. He communicated with the deputy assistant district attorney and apprised him of the facts. Donovan had an opinion from a handwriting expert that the endorsements of the various instruments, with one exception, were similar to the specimens of appellant's handwriting secured from the USES. Donovan, as a part of his investigation

of appellant, called upon Mr. Hagadorn, manager of the USES and obtained from him a specimen of appellant's handwriting and a list of absences from his work. Donovan stated there was no similarity between the signatures on the other instruments bearing the forged signatures of appellant and that on the Toom check. The list of absences shows that appellant was absent from his employment nine times from September 24 to December 24, 1945. These absences, with one exception, failed to coincide with the dates of the theft of the checks which bore the forged endorsement of appellant. The Toom check, being the one cashed at the Savery Hotel on December 20, had been returned and the authorities had knowledge thereof.

I will now set out from the record facts appearing therein which I think unerringly point to appellees as being the instigators of the arrest and prosecution of appellant.

The Toom check for $50 was stolen from the Brady Apartments on December 19, 1945. It had been mailed from Pella, Iowa, and it was payable to Mary Jane Toom. This check, with the name of the payee changed to William C. Minard, was on December 20, 1945 presented to the assistant manager of the Savery Hotel, one Arthur Johnston, who O.K.'d it, after which it was cashed by the hotel. The person presenting it was a stranger to Johnston. Some days thereafter this check was returned by the bank on which it was drawn, and the manager of the hotel, J. E. Whalen, and Arthur Johnston were advised that payment had been refused on account of the forgery. The bank charged the check back against the hotel account on December 27, 1945. The hotel management rather reluctantly took up the discredited check. The hotel employees called this to the attention of Detectives Dawson and Fitzgerald of the city of Des Moines, both of whom were daily in consultation with Inspector Donovan. These two officers worked for the most part in running down crimes along similar lines—the uttering of forged and altered instruments. Donovan later called at the hotel and conferred with Whalen and Johnston about the Toom check. While Johnston proceeded to the USES, taking the check with him for the purpose of identifying appellant as the one who had induced him to cash the Toom check, Donovan stayed at the hotel. Johnston's trip immediately followed his conference with Donovan.

He arrived there and says that he pointed out appellant as the man who had presented the check. Appellant's testimony as to what happened at such time is in sharp conflict with that given by Johnston. Johnston said that he picked appellant out without the aid of anyone; appellant said that someone called his name and then Johnston came to him and told him he wanted to talk to him. Appellant said that there were a lot of people about and he went to an office where he and Johnston could be by themselves; that Johnston showed him the check and the affidavit attached, "He said, '*I want my $50.00.*' I said, 'I think you are wrong, the FBI knows all about this, and they are on the case.' And he said, 'No, you are the boy.' He said, 'You show me your Masonic card', which I did not carry because I didn't have one, and he said, 'You show me your discharge.' Well, I never carry my discharge with me, and he said, 'Well, you are the one, all right.' And I said, 'I am sorry about the whole thing, but they know all about it.' So we walked downstairs and I said that I believed that I had lost my discharge, and that is when he made the remark it was an original discharge, and I told him that was a lie because my original discharge had never been out of the house, only on several occasions, and this certainly wasn't one. So his parting message was, '*I am not going to pay for this, by God someone is,*' and that is the last I saw of the gentleman." (Italics supplied.)

The record shows that Donovan was waiting at the Savery Hotel office and talked with Whalen and Johnston before the latter went to the USES to identify appellant as the man who had cashed the Toom check; that they talked about it, and Minard; that later Johnston phoned and talked to both Whalen and Donovan and told them, "The man is here." Later he returned and again talked to Donovan. Johnston told Donovan that appellant was the man who had cashed the Toom check at the Savery Hotel. Johnston did not tell Donovan that the apparent failure of appellant to produce his Masonic card (receipt) and his discharge papers was what convinced him as to the identity. Neither did he tell him that appellant in no way resembled the stranger who had presented the check. That afternoon Donovan went to the USES and took appellant into custody and had him placed in jail and on the following morning filed a charge in the

Municipal Court of Des Moines for obtaining money under false pretenses. He offers a rather lame explanation for such act by saying that in so doing he was "hornswoggled." The record shows that appellant was incarcerated approximately nine days and was later released on bond, was indicted on the charge made by Donovan, which charge was dismissed on February 15, 1946. Federal indictments based upon information given by Donovan were dismissed by the United States district attorney on November 21, 1946.

I think that the jury could find from the evidence that Johnston's action in identifying Minard, appellant, set in motion the arrest and charge. For months Donovan and the police detectives had known of the existence of appellant and his employment, his residence, and that numerous instruments, checks, etc. had been cashed where appellant's name had been inserted and endorsed in his name. To me it is clear that all that was wanting and what they were waiting for was someone to identify the culprit. Whether or not Johnston had acted in good faith in making the investigation would call for a consideration of the facts and circumstances existing at that time. Johnston had never seen appellant before he met him at the USES. The individual who presented and cashed the check bore no resemblance to appellant. Johnston O.K.'d checks many times, and he stated that he remembers various details—a ring, type of clothing, etc. When he talked with appellant he asked about a Masonic card, and discharge papers, certainly matters which would have little to do with identification. Asking for the card and the discharge papers certainly would warrant the inference that he was not at all sure of his identification. While the explanation given by appellant as to said card and papers was reasonable, still to Johnston they were unsatisfactory. He made no effort to inquire as to appellant and his record or anything about him. The fact that he took the check with him would throw light on his attitude, his purpose and his good faith. For the purpose of identification that check was not necessary. All concede that the handwriting of the endorsement thereon, purporting to be that of appellant, had no similarity to his true signature.

The evidence shows that Johnston put his finger on appellant and identified him as the man who cashed the check, with

a basis of nothing tangible or reliable—in other words, the jury could properly find that his actions in so doing were highly reckless and malicious. I think that they could properly find that his main motive was to avoid being called upon to make good the $50. There was evidence that his opening words to appellant were, "I want my $50.00", and he closed the interview by saying to appellant, "I am not going to pay for this, by God someone is."

The principal matter in dispute is whether or not there was sufficient evidence to show that appellee instigated the charge against appellant. The burden would be upon appellant to so show. Dugan v. Midwest Cap Co., 213 Iowa 751, 239 N.W. 697; Holden v. Merritt, 92 Iowa 707, 61 N.W. 390. Appellee argues that all he did was furnish information to the prosecuting officers and that at the request of Inspector Donovan he identified the appellant as the party who cashed the Toom check, and that what he did was not of his own initiative but was at the request and direction of the officers. Donovan finally admitted, after giving a lot of evasive answers, that it was the identification made by Johnston which caused him to act. He did say that while the attitude and conduct of appellant did not satisfy him, still he would not have proceeded as he did without Johnston's identification. This court has passed upon such a claim in its decisions. Holden v. Merritt, supra. In Bair v. Shoultz, 233 Iowa 980, 982, 7 N.W.2d 904, 905, the court said: "The machinery of the criminal law started when the defendant told his story to the county attorney." In Holden v. Merritt, supra, 92 Iowa at page 709, 61 N.W., page 391, this court, speaking through Justice Deemer, said:

"It need not be shown that the defendant ordered or directed the warrant or process to issue, or that he participated in its execution. If he, on his own motion, gave information or made complaint to the officers of the law in such a manner as that, in the regular and ordinary course of events, an arrest must be made, or will probably follow, this is sufficient to warrant the jury in finding him the real prosecutor."

We have set out in many cases the essential elements of the action for malicious prosecution. Included therein is that the

same was begun on the instigation or pronouncement of the defendant. In support of this rule see Bair v. Shoultz, supra; Richmond v. Whitaker, 218 Iowa 606, 255 N.W. 681. In the case last-cited this court approved an instruction which set out to the jury the necessary elements to be shown in such an action. So far as we have been able to find, the holding of this court in Holden v. Merritt, supra, is still the law of Iowa, and the reasoning therein has not been criticized by any decision of this court.

In 54 C. J. S., Malicious Prosecution, section 14, page 966, the general rule stated is that the "defendant must have been the proximate and efficient cause of maliciously putting the law in motion in the original proceeding." In the case of Hughes v. Van Bruggen, 44 N. Mex. 534, 538, 105 P.2d 494, 497, there is set forth the following:

"In order to charge a private person with responsibility for the initiating of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated expressed by direction, request, or pressure of any kind was the determining factor in the official's decision to commence the prosecution or that the information furnished by him upon which official acted was known to be false."

The above was set forth in Restatement of the Law, Torts, section 653, comment g.

Donovan, the official who filed the charge against appellant, says that the information which Johnston gave him was the thing which induced his actions; that prior to that time he was not satisfied as to the conduct of appellant, but that he would not have moved on that alone. Johnston's "This is your man" set him into action.

Appellees cite, in support of the ruling of the trial court, Dickson v. Young, 208 Iowa 1, 221 N.W. 820. There the evidence showed and this court found that the prosecution was begun by the United States district attorney upon his own investigation and not by the defendant therein. Appellee further argues that in making the identification he acted on the direction of the officers of the law. The arrest was conceded. The dispute was as to whether or not Johnston was the instigator. This being a matter in dispute raises a fact question—one for the jury.

Appellee argues that as the prosecution was begun by Assistant United States Attorney Level, upon information furnished him by Inspector Donovan, consequently appellant could not claim that it was Donovan or Johnston who started the prosecution. That these two were working together cannot be denied—Donovan to catch the mailbox thief, and Johnston to avoid being called upon to make good the $50 check. The record shows that Donovan signed the information in the municipal court, which charged appellant with the crime of obtaining money by false pretenses, certainly not a Federal offense. As heretofore stated, he said that in signing that charge he was "hornswoggled"—a somewhat lame and unsatisfactory explanation for one who was filling the responsible position of Federal postal inspector. Johnston had cashed a forged check and Donovan knew this; Johnston in his zeal to save the $50 pointed his finger at appellant, and Donovan went into action at once. Donovan says that it was Johnston's identification which got him into action.

After evasion and equivocation covering approximately eight pages of record in the cross-examination of Donovan, we find the following: "Q. The only evidence you had of his guilt of the crime with which he was charged in that information was the information given you by Johnston; will you please answer that question? A. That is right." From this very answer a jury could fairly infer that it was Johnston working with and through Donovan who set in motion the machinery of the law.

There is other evidence in the record which a jury might properly consider in passing upon the fact question as to whether Johnston by his identification instigated the prosecution. It is my judgment that the facts as set out in the late case of Schnathorst v. Williams, 240 Iowa 561, 36 N.W.2d 739, were not as strong in favor of the plaintiff as in the instant case. In that case the defendant first consulted the county attorney and claimed that he made a full and complete disclosure of the facts, and an arrest followed. This court held it was a question for the jury. For other Iowa cases in this connection see Wilson v. Thurlow, 156 Iowa 656, 137 N.W. 956; Drake v. Keeling, Iowa, 287 N.W. 596; Halligan v. Lone Tree Farmers Exchange, 230 Iowa 1277, 300 N.W. 551; Johnson v. Miller, 82 Iowa 693, 47 N.W. 903, 48 N.W. 1081, 31 Am. St. Rep. 514. See also 34 Am.

Jur., Malicious Prosecution, section 162; Davis v. McMillan, 142 Mich. 391, 105 N.W. 862, 3 L. R. A., N. S., 928, 113 Am. St. Rep. 585, 7 Ann. Cas. 854.

I would reverse.

OLIVER, GARFIELD and BLISS, JJ., join in this dissent.