MARSHALL LUKECART, appellant, v. SWIFT & Co., LEONARD RUMPF and GENE KELLY, appellees.

No. 51398.

*(Reported in 130 N.W.2d 716)*

OCTOBER 20, 1964.

Pappas & Senneff, of Mason City, for appellant.

Beck & Butler, of Mason City, for appellees.

SNELL, J.—This is a law action for malicious prosecution. Plaintiff seeks actual and punitive damages. At the close of all the evidence the trial court directed a verdict for defendants. Plaintiff appeals.

Defendants in this action are Swift & Company, Leonard Rumpf, plant superintendent, and Gene Kelly, plant supervisor, of Swift's fertilizer plant at Mason City.

Prior to May 4, 1962, plaintiff had been employed at the Swift & Company fertilizer plant in Mason City. He had been so employed since 1955. His work was entirely satisfactory. At first he wheeled fertilizer bags on a hand truck. He soon became a "checker" loading outgoing trucks and counting the bags loaded. Eventually he became a mechanic's helper and foreman of a three-man mixing crew. As such he operated a mixing machine. When so engaged he had nothing to do with loading bagged fertilizer. After he went on the mixing crew he did not

work on the loading crew but on a few occasions loaded bulk trucks at night. Plaintiff's own testimony is indefinite but it appears that he had loaded customers' trucks with fertilizer, but only on specific orders of the superintendent. The trucks were loaded with the kind and amount of fertilizer indicated on an invoice or loading order from the main office. Except to load out pursuant thereto plaintiff had no authority in connection with the shipping orders.

It was the firm policy of the company and well known to employees that no truck was to be loaded without authority from the office. Sometimes during a rush period delivery of the written shipping order would be preceded by verbal directions from the office. Plaintiff claimed that he had, when the office was closed, loaded trucks without orders and had them sit in the yard and wait until the office opened to get a ticket but he had never done this after his own shift had terminated. Extensive investigation by the sheriff's office and testimony of plant employees completely failed to corroborate plaintiff's claim of loading trucks without an order. There was no testimony that defendants had known of any deviation from the company policy and rule against loading a truck without orders.

Office hours for the processing of written orders were not always coextensive with the hours of plant operation. Some years during the busy season the plant operated 24 hours per day. The plant was not so operating in 1962. In May 1962 there were two shipping crews and two mixing crews at the plant. The day shipping crew worked from 7 a.m. until 3:30 p.m. The night shift started at 3:30 p.m. and worked until midnight. The mixing crew day shift started at 7 a.m. and worked until 5 p.m. The night shift started at 5 p.m. and ended at 3 a.m. From 3 a.m. the plant was closed until reopened in the morning. A mechanic came on duty at 6 a.m. before the day shift workmen. No one claimed that any trucks had ever been loaded when the plant was closed.

On May 3, 1962, plaintiff was foreman of a mixing crew of three men starting work at 5 p.m. and expected to work until 3 a.m. May 4. After about midnight there were no other people in the plant.

At about 2:15 a.m. on May 4 plaintiff shut down the mixing machine and sent his helpers home. Plaintiff said he did this because they ran out of acid used to blend the fertilizer. The lack of acid was not corroborated by anyone. The mechanic who checked the supply the next morning and before any change in the tank testified that the gauge glass showed enough acid to run an hour or hour and a half. This would have been more than enough to last beyond plaintiff's work shift.

Plaintiff testified that shortly after starting work on the afternoon of May 3 he had a conversation with Lyle Severe, a trucker who frequently bought and hauled fertilizer from the plant. Plaintiff said that Mr. Severe told him he was going to get a load that night "and to stick around and wait for him." This statement is not corroborated by Mr. Severe. On direct examination testifying for plaintiff he said: "During the day of May 3rd, 1962, I went to the Swift plant at about 5:30 in the afternoon and saw both Mr. Lukecart and Leonard Rumpf. I did not make any arrangements with Lukecart to pick up any fertilizer at that time. I had not made any arrangements with anyone to be there to load my truck or get the fertilizer."

Mr. Severe testified that he had received a postcard reading as follows:

"Authorized Swift Dealer:

"Effective Monday, April 23,
"our loading hours will be
"7:00 am to 11:00 pm Monday
"through Friday. Saturday
"loading hours will be 7:00 am
"to 2:00 pm effective Saturday,
"April 28. Any trucks in the
"yard by 2:00 pm on Saturdays
"will be loaded.

"Orders for loading after
"5:00 pm should be phoned into
"our office before 5:00 pm so
"shipping tickets can be writ-

"ten. We hope to give you the
"usual Swift service.

> "Swift & Company
> "Mason City, Iowa
> "PH: GArden 4–3876

"P.S. Keep this card handy
> "for ready reference."

After sending his helpers home about 2:15 a.m. plaintiff "waited around for a while." He then closed the plant, got in his car and drove away. He drove west on a public road to Federal Avenue, made a "U" turn and drove back to the plant. He explains his return in these words: "Then I thought maybe. I should wait and see if Mr. Severe would show up so I drove back to the plant." He went into the locker room and then came out and sat in his car.

From this point on it must be remembered that we are not considering the guilt or innocence of plaintiff in a criminal prosecution. We are considering whether there were reasonable grounds or probable cause for defendants' subsequent actions.

Plaintiff's work shift had ended. The plant was closed and the lights were out. As foreman of a mixing crew plaintiff had no duty to load trucks. There was neither loading order nor authority for anyone to load a truck with fertilizer at or after 3 a.m. Such a loading was contrary to well-known company rules.

Mr. Severe testified that he drove his truck to the plant about 3:30 a.m. and backed up to the warehouse dock. After some conversation with plaintiff who had been waiting, Mr. Severe, plaintiff and an employee of Mr. Severe proceeded to load over thirteen tons of sacked fertilizer on the truck.

Mr. Severe, with his truck and helper, had been at the plant on the afternoon of May 3. The helper inquired of Gene Kelly, plant supervisor, how late the plant would run that night. Mr. Kelly replied "twelve midnight." The helper then said: "I can't understand that, we are supposed to pick up a load at three o'clock in the morning." After asking "did you say three o'clock?" and the helper answering "yes", Mr. Kelly walked away in surprise. He told Mr. Rumpf what he had heard. Mr. Kelly and Mr. Rumpf agreed to watch the plant that night. Mr.

Rumpf obtained permission to park their car in a yard about a block and a half from the Swift plant. From there they could see the plant.

Mr. Rumpf and Mr. Kelly waited at this vantage point from about 2 a.m. They heard the mixing mill shut down. They saw the plaintiff's two helpers leave the plant. They saw plaintiff's car leave and shortly return. They saw lights at the plant go on and off. They saw the truck enter the plant. They then walked to the plant office and called the sheriff. Mr. Rumpf, who made the call, identified himself, said where he was, said there was a truck loading fertilizer without authority and asked that an investigating officer be sent at once. In response to this call deputy sheriff Jerry Koerber arrived shortly. Mr. Rumpf, Mr. Kelly and the deputy walked to the truck. Mr. Rumpf ordered the loading of fertilizer halted and the truck unloaded. The testimony of Mr. Rumpf then related the following:

"Q. * * * Now what did you say then to Mr. Lukecart? A. Mr. Lukecart jumped off the lift truck and came back towards us.

"Q. What did he say, if anything, at that time? A. He said, what's wrong, what's wrong, what's wrong?

"Q. And what did you say? A. I said you know darn well what's wrong. I asked him if he had an order, shipping order to load this truck. He told me no. I said, to the best of my ability to recall this, I said Marshall, I am sorry this happened, it will never happen again, you are through as of right now.

"Q. Did Marshall say anything to you? A. Yes, again he said we were just going to load him and get a shipping ticket in the morning. * * *

"Q. May I stop you for just a minute. The statement that you made then to Mr. Lukecart out on the dock, he understood that you were discharging him all right? A. He should have.

"Q. His subsequent actions, he was in and out, he was cleaning out his locker? A. I think he was, I can't say for sure. Mr. Koerber asked if we were going to prefer charges and I told him I would have to talk to my manager Mr. Smith and I picked up the phone and called him.

"Q. What did you say to Mr. Smith? A. I told Mr. Smith—

first I apologized for getting him out of bed—I then told him I was out at the plant and that Mr. Kelly was with me; that the deputy sheriff was with me, and that we had found Mr. Lukecart and Mr. Severe loading fertilizer onto Mr. Severe's truck; that we had stopped them. First of all I guess I told him they did not have a shipping order for this; that we stopped them from loading, and that I had fired Mr. Lukecart and that whatever action, I mean, action, I am talking about Swift & Company action, that was going to be taken in regards to fertilizer and Mr. Severe that would be up to Mr. Smith to handle, and I asked him, I told him, that the deputy sheriff had asked me if we were going to prefer charges.

"Q. And what did Mr. Smith say to you? A. He said to me he thought we should wait until eight o'clock in the morning or thereabouts and contact our Chicago office and bring them up to date on the matter first.

"Q. Then what did you say to Mr. Koerber with respect to preferring any charges at that time? A. After I finished talking to Mr. Smith, I passed this information on to Mr. Koerber that we would not file charges at that time."

Severe and Lukecart were not detained that night.

The testimony of Mr. Kelly regarding the events and conversation was substantially the same.

Plaintiff testified as follows:

"I was filling the hoister when I saw the Sheriff's car drive up. I got off the hoister and Mr. Rumpf, Kelly and Koerber jumped up on the dock. Everybody started hollering and talking and accusing me of stealing the fertilizer. Mr. Rumpf told me I was done right now. We went into Mr. Rumpf's office and we talked some more.

"Prior to this time no one at Swift & Company, including Mr. Rumpf or Mr. Kelly, had ever said anything to me about my work or about taking fertilizer. We all then went over to the office and Mr. Rumpf told me I was done right now and I believe he called Mr. Smith. Mr. Koerber was in the office and wrote down the details as to what happened. We exchanged a few words, I don't remember exactly what was said.

"Mr. Rumpf asked me if I would unload the truck and I

refused. I asked Mr. Koerber if he wanted me anymore and he said he would get in touch with me at home if he wanted me. I turned in my stuff and left.

"A day or so later I saw Mr. Koerber and he asked me to come to his office and have a talk with him, which I did. He asked me about the whole matter again and took notes. Later Mr. Koerber called me one night and wanted me to go to Des Moines and take a lie detector test. First I told him I would and later I called him back and told him I wouldn't because I thought I should see a lawyer first. I eventually took a lie detector test."

Deputy Sheriff Koerber testified that when he arrived at the plant Mr. Rumpf and Mr. Kelly came up to the car, "one of them said: 'We have been waiting for this for a long time. These men are taking fertilizer and they aren't supposed to be doing that.' * * *

"Q. At that time state whether or not Mr. Rumpf asked you to arrest Mr. Lukecart. A. Initially when we first got on the dock he said take him, he said you might as well take him with you, you might as well arrest him because they are stealing this powder.

"* * *

"I told all of them that I would take the information to the County Attorney and the Sheriff and would contact all of them the following day, which I did."

The next morning the whole episode was reported to Swift & Company headquarters, the company's local counsel, the county attorney and the sheriff's office. Between that date, May 4, 1962, and June 13, 1962, extensive investigation was conducted.

In this particular Deputy Sheriff Koerber testified:

"After I made my investigation at the Swift plant on the early morning of May 4, 1962, in response to Mr. Rumpf's phone call I talked to everyone who was out there that night or early morning.

"I contacted Mr. Butler, the County Attorney, on the morning of May 4 and talked to him in his office. At that time I told him everything I had ascertained up to that time with respect to statements I had obtained. Mr. Butler indicated to

me we should investigate all possible leads and try to obtain all the facts that were necessary for the case that bore on the case at all. We talked about specific people to interview and we agreed that I should talk to all the employees of the Swift plant that I could get appointments with. I did talk to these employees and later reported my findings back to Mr. Butler and gave him copies of all my interviews and reports. I talked with Mr. Rumpf, Kelly, Smith, Callicchia, Ullom, Henry, Lowe and Mrs. Lowe. I don't believe I interviewed Glenn Billings. I also talked with Mr. Lukecart about the incident and he stated that trucks hadn't left the plant without loading orders but that trucks had loaded and waited to obtain loading invoices. I asked him to give me the names of any persons that might have done that but he did not give them to me. He did say they came from the Aredale or Dumont area. I checked in that area and could find no drivers who had loaded fertilizer at the Swift plant without a loading order. At one time Lukecart told me he had the names of seven drivers but said he would not give me that information because he wanted to keep it for his attorney to use in court if necessary. I tried to locate such drivers in the Dumont and Aredale area but was never able to locate any. I spent a considerable amount of time in checking this out.

"I also talked with Severe about this incident. Severe never gave me any names of any persons who might have gotten loaded and waited for morning to get loading orders.

"I started my investigation of this matter at about 3:30 a.m. May 4, 1962, and continued it until just prior to the time the Grand Jury considered the matter. I spent a great deal of time investigating everything involved in the incident. I interviewed the people at the Swift plant and found them cooperative. They answered my questions and took me around the plant."

Mr. Butler was county attorney and a partner in the law firm of Beck & Butler. Mr. Beck was counsel for Swift & Company. Mr. Butler made a separate and personal investigation.

He went to the plant and studied its operation. He interviewed witnesses and talked with all the employees at the plant whose names later appeared on the Grand Jury indictment, including Mr. Rumpf and Mr. Kelly. He also talked to Mr. Beck.

Mr. Butler testified at length as to what was told him during his investigation. It was substantially the same as we have related. He then said:

"After my conversations with Rumpf and Kelly and my investigation, I suggested we would take this matter to the Grand Jury. I told Mr. Rumpf, Mr. Kelly and Mr. Smith that was the decision I was making. The Grand Jury considered the case in June of 1962. * * *

"A. * * * I think I had some conversation with Mr. Beck, he was representing Swifts, and I am certain I must have told Mr. Beck, and maybe I mentioned it to Leonard and Gene or Mr. Smith too, it seemed to me the best way was to get all these facts together and to find out whether or not the matter should go to the District Court is for the Grand Jury to make the decision.

"Q. In that connection then would this be a fair statement that at the time you were considering this matter Mr. Beck was, and I suppose had been for some time, representing Swift & Company in matters in this area? A. Yes.

"Q. And in that connection with the continuance of this matter as to how you were going to handle it, you did talk with Mr. Beck about it? A. Yes, I am sure I had some conversations with Mr. Beck.

"Q. And also with Mr. Kelly and Mr. Rumpf? A. I don't think I talked with them very much as to my decision that I had to make as to whether or not to take it to the Grand Jury. I talked to them about the facts, but the decision whether it should go to the Grand Jury was mine rather than theirs."

In an attempt to impeach the testimony of the county attorney that it was his decision to submit the matter to the grand jury plaintiff's counsel referred to a memorandum of a conversation between the county attorney and the attorney for plaintiff. It was prepared by plaintiff's attorney shortly after the conversation on November 9, 1962, nearly five months after the indictment of plaintiff, shortly after a polygraph test given plaintiff, during the October Term of Court when the indictment was dismissed, and shortly before this action for malicious prosecution was commenced. Plaintiff claimed that the substance of the conversation was that the county attorney "stated he did not advise

1278

Swift & Company or any representative of Swift & Company that they should file criminal charges against Marshall Lukecart, and as far as he was concerned it was solely the responsibility of Swift & Company and their representative." The county attorney admitted having a conversation with plaintiff's attorney but said he was referring to this civil action in which, because of his official position, he could not get involved. The written memorandum was not offered in evidence. We do not consider this conversation of any importance. There is no evidence that any defendant herein ever filed any charge against plaintiff and the county attorney repeated, "Nobody had pressured me into starting this action before the Grand Jury."

On June 13, 1962, the grand jury, listing ten witnesses in support thereof, indicted plaintiff for conspiracy and larceny in the nighttime. For some time and until he could furnish bond for his release plaintiff was held in jail under the indictment.

Except where otherwise indicated the factual situation appears without dispute.

 I. Proof of intent to commit the act is a necessary proposition in a prosecution for conspiracy under chapter 719, Code of Iowa, and for larceny under chapter 709, Code of Iowa. "The intent with which an act is done is a state or condition of mind and is usually difficult to prove by direct evidence. The intent in the doing of an act is usually inferred from all the facts and circumstances surrounding the act to be gathered from all the evidence in the case." This is a "stock" instruction frequently given in such cases.

Plaintiff insisted that he had no felonious intent. With his consent he was given a polygraph test. From this test the examiner concluded plaintiff was telling the truth.

Polygraph tests have been the subject of many arguments and articles. It is generally admitted that as an investigative tool and in the hands of a competent, trained and experienced examiner there have been encouraging and salutary results from such tests. Many experts in the field contend that in the hands of a qualified examiner the lie detector technique offers a valuable aid. An interesting article on the technique and value

appeared in American Bar Association Journal in May 1964, Volume 50, Number 5, page 470.

We discussed lie detector tests in State v. Green, 254 Iowa 1379, 1383 et seq., 121 N.W.2d 89, 95 A. L. R.2d 810, and disapproved reference thereto in a trial of a defendant accused of arson. The record in the case now before us is barren of any showing that the results of plaintiff's test would have been admissible in court. However, the results in the form of additional evidence were presented to the grand jury. Thereupon, the grand jury, through the county attorney and the county attorney in his official capacity, recommended dismissal of the charge. The indictment was dismissed by the court because of reasonable doubt as to guilt of the accused.

This action for malicious prosecution followed soon thereafter.

II. Schnathorst v. Williams, 240 Iowa 561, 36 N.W.2d 739, 10 A. L. R.2d 1199, exhaustively reviews the authorities in malicious prosecution cases. In significant matters that case differed factually from the case at bar but the rules were precisely stated. See page 572 of 240 Iowa. "To recover, the plaintiff had the burden to show: (1) the criminal prosecution of plaintiff (2) its procurement by defendant (3) its termination favorable to plaintiff by the failure to indict resulting in his discharge (4) lack of probable cause, and (5) malice in the instigation of the prosecution." The case has been frequently cited and its principles followed.

III. In the case before us the first essential appears without dispute. Plaintiff was indicted by the grand jury, arrested and held thereunder until released on bond.

IV. As the second essential plaintiff must show the procurement of prosecution by defendants.

There is no claim that the indictment was at the instance of a private prosecutor under the provisions of section 772.2, Code of Iowa. While in most malicious prosecution cases the instigation of the criminal prosecution has been by the filing of an information by defendant such filing is not a prerequisite. "It matters not that the defendant did not sign an information

and cause the arrest." Bair v. Shoultz, 233 Iowa 980, 983, 7 N.W.2d 904.

While questions of probable cause and intent are of vital importance and will be considered infra, the question of what constitutes such a procurement as is necessary to support a claim for malicious prosecution is entirely different.

The growing reluctance of people to help, interfere, even "call the cops" or testify when crimes are being or have been committed is shocking. Because of dislike of inconvenience or fear of consequences, by witnesses or people with information, crimes are committed and the perpetrators go unpunished. Disdain for the law and disrespect for law enforcing officers grow and constitute a threat to law and order. It is certainly not the province of the courts to create a legal climate where it is unhealthy or financially dangerous to call on peace officers for help or give information or testimony to officials and official agencies.

The importance of protecting individuals from the harassment of improper charges and the procurement thereof is well recognized but we cannot go so far as to say that whenever a prosecution fails those who called for an investigation or gave testimony are liable for malicious prosecution.

The specially concurring opinion in Minard v. Boss Hotels Co., 241 Iowa 606, 614, 40 N.W.2d 276, contains statements and quotations in point.

"A false-arrest case is materially different from other tort actions where the injury has resulted from negligence, either actionable or contributory. A mere statement of the above rules governing a false-arrest case shows that in this type of action as against a private person, there is a wide area for damage without wrong. The 'innocent' person is just as much harmed if he fails to show the proceedings were initiated or procured by the private person or if he fails to show want of probable cause in the private prosecutor or if he fails to show termination of the proceedings in his favor. Such damage is one of the incidents of life in organized society. It is part of the price all citizens pay for the benefits of government.

"In the introductory note to chapter 29, Restatement of the

law of Torts, it is said of these restrictions that the law imposes in a false-arrest case against a private person that they 'represent an adjustment between two highly important social interests. The first is the interest of society in the efficient enforcement of the criminal law, which requires that private persons who aid in the enforcement of the law should be given an effective protection against the prejudice which is likely to arise from the termination of the prosecution in favor of the accused. The second is the interest which the individual citizen has in being protected against unjustifiable and oppressive litigation of criminal charges, which not only involve pecuniary loss but also distress and loss of reputation.'

"The very first restriction imposed upon recovery for wrongful prosecution of a criminal proceeding is the burden placed upon the plaintiff to prove the criminal proceedings were either initiated by the defendant or the defendant procured the institution of the criminal proceedings. Here it is clear the defendants did not initiate the criminal proceedings, since the sworn charge was made by the Federal officer, so the only question is whether the defendants procured the institution of the criminal proceedings. In Restatement of the Law, Torts, section 653, comment b, the rule is stated:

" 'A person who does not himself initiate criminal proceedings may procure their institution in one of two ways: (1) by inducing a third person, either a private person or a public prosecutor, to initiate such proceedings, or (2) by prevailing upon a public official to institute them by filing an information. It is, however, not enough that some act of his should have caused the third person to initiate the proceedings. One who gives to a third person, whether public official or private person, information of another's supposed criminal conduct or even accuses such other thereof, causes the institution of such proceedings as are brought by the third person. The giving of the information or the making of the accusation, however, does not constitute a procurement of the proceedings which the third person initiates thereon if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit.' "

1282

 The last sentence in this quotation is important. None of the defendants ever filed an information. Separate and extensive investigations by and through the sheriff's office and the county attorney were conducted over a period of forty days before any charge was filed. At least ten witnesses testified before the grand jury. The grand jury returned an indictment. There is no claim that any defendant ever gave any false information. There is no evidence of coercion or pressure on the county attorney by defendants. The county attorney assumed full responsibility for presenting the case to the grand jury.

There was no prosecution of plaintiff except by indictment. From the evidence in this case reasonable minds could not conclude that the prosecution was procured by defendants.

Plaintiff-appellant argues that the prosecution was initially instituted and procured when defendant Rumpf called the sheriff's office for help and then made accusations against plaintiff when the deputy sheriff arrived at the plant. The premise upon which this argument rests fails because plaintiff was neither held, arrested nor prosecuted on the basis of the call to the sheriff's office nor on accusations made on May 4, 1962.

We are not willing to hold that a call to the sheriff's office for an investigation and a disclosure of facts and expression of opinion not resulting in an arrest or prosecution is sufficient to support a finding of procurement. The prosecution in this case was not so procured.

The evidence failed to generate a jury question on the second essential.

V. The third essential listed is the termination favorable to plaintiff by failure to indict resulting in his discharge. Here there was no failure to indict. Based on subsequently developed evidence (if results of a lie detector test can be called evidence) the indictment was dismissed. Because of our conclusions expressed in Division IV, supra, and in subsequent divisions, we need not discuss what, if any, difference there might be between a failure to indict and an indictment followed by dismissal because of newly developed evidence.

 VI. The fourth essential element plaintiff must estab-

lish is lack of probable cause. Here again plaintiff failed to generate a jury question.

By chance remark defendants learned that a trucker was returning late at night and after the plant was closed to get a load of fertilizer. This was contrary to the company rules and regulations. How or from whom the fertilizer was to be obtained was not stated but the information was certainly enough to alert defendants to watchfulness. To watch and determine if there was such an unauthorized removal of property was a perfectly natural and proper procedure by defendants. There was no enticement. There was no nefarious or objectionable "spying" as suggested by plaintiff.

Property of Swift & Company was being removed and loaded in a truck without the consent of the owner by unauthorized persons during early morning hours when the plant was closed. Such activities could lead to but one conclusion, i. e., larceny.

Every element incident to larceny was present except proof of intent. As stated, supra in Division I, intent is a state of mind difficult of proof by direct evidence. However, a person is presumed to intend the natural consequences of an act intentionally done. Here the natural inference from what was observed was that there was an attempt to steal. When an observer sees property being improperly taken at 3:30 a.m. it is not necessary that he inquire as to the observee's state of mind before calling "the law."

Plaintiff argues that defendants should have called an attorney and obtained counsel before calling the sheriff and asking for an investigation.

We cannot accept any such requirement. To require that legal advice be obtained before calling for an officer when improper activities are observed would be disastrous to crime prevention and the apprehension of law violators. It would aid no one except an escaping criminal.

There is nothing in the record from which a jury could conclude that there was lack of probable cause for what defendants did.

VII. In malicious prosecution a plaintiff must establish

malice in the instigating of the prosecution. It is well established that plaintiff need not show "ill will", "hatred" or "express malice" on the part of defendants. Malice may be inferred by the jury from want of probable cause. Schnathorst v. Williams, supra, loc. cit. 574 of 240 Iowa and cases cited therein.

In the case at bar there is no claim of express malice. Plaintiff claims, with supporting evidence, that he had been a respected employee and had enjoyed good relations with defendants.

Malice cannot be inferred in the case before us because there is nothing from which an inference can be drawn.

VIII. The extent to which defendants in good faith relied on the advice of counsel need not be discussed. Plaintiff's case fails otherwise.

There is nothing in the record to indicate that defendants or any of them acted except in good faith.

Plaintiff when observed by defendants Rumpf and Kelly was engaged in an unauthorized and suspicion arousing activity. If his purpose was misconstrued he and not the defendants caused his misfortune.

Unlike most cases of malicious prosecution there is nothing here on which to base even a suspicion of ulterior motive on the part of defendants. They had nothing to gain by prosecution and no financial interest therein. As said by the trial court two citizens called attention of the authorities to circumstances that were highly suspicious and thereafter cooperated with the law enforcing machinery of the law.

The case is—Affirmed.

All JUSTICES concur except HAYS, J., not sitting.